SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,

v.

ELECTRONICS SECURITY CORPORA-
TION, a corporation, and Simeon
Miller, Defendants.

No. 4–61 Civ. 237.

United States District Court
D. Minnesota,
Fourth Division.

March 12, 1963.

John I. Mayer and C. Warren Goelz, of Chicago Regional Office, S.E.C., Chicago, Ill., and J. M. Klees, of St. Paul Regional Office, S.E.C., St. Paul, Minn., for plaintiff.

Harry S. Stearns, Jr., of Stearns & Kampmeyer, St. Paul, Minn., for defendants.

NORDBYE, District Judge.

This proceeding came before the Court for trial without a jury.

The Securities and Exchange Commission, hereinafter referred to as the S.E.C., brings this action against the Electronics Security Corporation, hereinafter sometimes referred to as E.S.C., and its President, Chairman of the Board, and principal stockholder, Simeon Miller, under Section 22(a) of the Securities Act of 1933 (15 U.S.C. § 77v(a)) and Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa). The plaintiff alleges that the defendants are engaged in acts and practices which constitute violations of Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q(a)), Sections 10(b) and 15(c) (1) of the Securities Exchange Act of 1934, as amended (15 U.S.C. § 78j(b) and 15 U.S.C. § 78o(c) (1)) and Rules 10 b–6 and 15 c 1–8 adopted thereunder. (17 C.F.R. 240.10 b–6 and 17 C.F.R. 240.15 c 1–8). The S.E.C. seeks a permanent injunction enjoining these acts and practices under Section 20(b) of the Securities Act of 1933 (15 U.S.C. § 77t(b)) and Section 21(e) of the Securities Exchange Act of 1934 (15 U.S.C. § 78u(e)).

Before discussing the alleged violations individually, it may be well to review the basic history of the corporation and the defendant Miller as they are intertwined therein in order to provide a basic framework in which to discuss the various transactions of which the plaintiff complains. On May 17, 1960, the corporation's articles of incorporation were filed with the Secretary of the State of Minnesota. At that time the corporation was known as Simeon Miller and Co., Inc., and the defendant Miller was its President. This newly formed corporation, as near as the Court can determine, was formed to take over the business of Simeon Miller and Company, a sole proprietorship which was engaged in the merchandising of mutual funds and life insurance. On July 29, 1960, the corporation registered with the S.E.C. as a securities broker-dealer as required by Section 15(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(b)). On August 18, 1960, the corporation's name was changed to its present name. On this same day at a meeting of the Board of Directors, the defendant Miller announced plans for a public offering of 30,000 shares of the corporation's stock. The subscription price of these shares was to be $3.45 per share, of which 45 cents per share was to be underwriter's commissions and the remaining $3 per share was to go to the corporation. An additional 20,000 shares of stock were to be given to the defendant Miller in consideration of various assets turned over by him to the corporation. A prospectus describing this offering was sent to the Minnesota Department of Commerce, Securities Division, under date of August 19, 1960. Pursuant to a meeting of the Board of Directors held on November 4, 1960, an amendment of the abovementioned prospectus bearing the date of November 8, 1960, also was sent to the Securities Division of this State. This amendment "split" the proposed offering 3 to 1, so that the public offering was to be 90,000 shares at $1.15 per share and the defendant Miller was to receive 60,000 shares instead of 20,000 shares. After being approved by the State, the public offering then began some time in late February or early March, 1961. In early May, 1961 the offering had been completely sold out. The proceeds of this public offering were approximately $92,799.75. On April 28, 1961, the company, in a letter to its shareholders over the signature of the defendant Miller, announced that it was going into the over-the-counter securities business. From that time until late in the summer, the primary efforts of the corporation were devoted to this activity.

On August 16, 1961, the Securities Division of the State served an order to show cause and a notice of hearing on the corporation for the purpose of determining whether or not its Dealer's license should be revoked. On September 29, 1961, one of the Judges of the United States District Court granted the plaintiff's motion for a preliminary injunction, enjoining the defendants from acting in violation of the above-mentioned statutes. On October 5, 1961, the corporation surrendered its Dealer's license to the Securities Division of this State, and at this time, if not some time before, the corporation ceased to exist as an active corporation. These circumstances may suggest that the issues which the plaintiff presents are now moot, but the Court concludes otherwise. See United States v. Parke, Davis & Company, 365 U.S. 125; 81 S.Ct. 433, 5 L.Ed. 2d 457; Id., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505.

Before discussing the alleged violations individually, it may be well to note, in so far as it is relevant thereto, that during the time these alleged violations took place the defendants were using the mails and the facilities of interstate commerce to effect securities transactions. The first two violations in which the plaintiff alleges the defendants are engaged are of Sections 17(a) (2) and 17(a) (3) of the Securities Act of 1933 (15 U.S.C. § 77q(a) (2) and § 77q(a) (3), which provide:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

\* \* \* \* \* \*

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

The S.E.C.'s contentions in regard to these violations are based on a series of letters sent by the corporation over the signature of the defendant Miller to shareholders of the corporation between April 28, 1961, and July 17, 1961, with particular attention being paid to the letters of May 26, 1961, and June 8, 1961. The S.E.C. contends that certain statements were made in these letters which in and of themselves and in connection with the then existing financial condition of the company constituted violations of Sections 17(a) (2) and 17(a) (3). The uncontroverted testimony of several witnesses was to the effect that they had purchased their stock in E.S.C. on the strength of the representations made in these letters. Thus there can be no doubt that the defendants obtained money by means of these letters. The issue which faces the Court in determining whether or not there has been a violation of Section 17(a) (2) is whether or not these letters contained untrue statements of material facts or omissions of material facts. And of course if the above issue is answered in the affirmative, these untrue statements and material omissions would constitute a practice or course of dealing which operates as a fraud or deceit upon the purchaser of the stock of the defendant corporation.

Starting first with the letter of June 8, 1961, the following paragraph appears, at pp. 1–2:

"We will be the *principal underwriters* of Aviation Space Development Corp. The sale of this stock should produce sales commissions of $90,000. It is a Washington D. C. corporation presently in possession of contracts with Zeckendorf of New York, the board is composed of exceptional business men and independently wealthy individuals. No local broker will participate in the selling

group, but two NYSE firms, one in New York and one in Washington D. C. will be in the selling group. It will be Reg. A'ed through the SEC for National distribution. There is no question of this being many times over subscribed. Place indications on or before July 1. This is another underwriting which is a part of our goal to develop enough commissions this year to earn $1 per share. We should fulfill our goal to make this stock realistically worth $20 per share."

The Aviation Space Development Corporation was a real estate development company which was incorporated in the District of Columbia on May 1, 1960, as Av-Spa Development Corporation. At the time the above letter was written, Av-Spa was negotiating with Webb & Knapp, Inc., of New York, whose President is William Zeckendorf, for the construction of two office buildings in Washington, D. C., which were to be rented to companies engaged in air and space work. Several weeks earlier, the defendant Miller had proposed to V. J. Adduci, president and Chairman of the Board of Av-Spa, that the defendant corporation handle the underwriting of any public offering which Av-Spa might make. Mr. Adduci agreed to this, but told Miller that it was very likely that the corporation would be privately financed. However, it was apparently understood by Mr. Adduci and the defendant Miller that if a public offering was made it would be in the neighborhood of $600,000, or at least that is the figure on which the defendant Miller based his sales commission figure of $90,000.

On the basis of these facts and others adduced at the trial, the Court finds that this paragraph contains a number of untrue statements of material facts and material omissions: (1) The statement that Electronics Security Corporation would be the *"principal underwriter"* is materially misleading because it omits to state that the defendant corporation was to be the principal underwriter only if Av-Spa failed to obtain private financing; (2) the statement is untrue for at the time the letter was written Av-Spa already had obtained private financing, a fact known to the defendant Miller, thus eliminating the need for an underwriting by the defendant corporation; (3) the statement that the corporation was then in possession of contracts with Zeckendorf of New York was also untrue for the evidence clearly discloses that Av-Spa and Webb & Knapp were still negotiating as of June 8, 1961; and (4) the statement that two New York Stock Exchange firms were to participate in the selling group is also untrue for it is clear that in view of the fact that Av-Spa had obtained private financing, there would be no selling group, and it is also clear that at no time did the defendant Miller ever have in mind any New York Stock Exchange firm for such a participation. Then in conjunction with the above-mentioned misstatements and omissions, the letter goes on to state in the very same paragraph that it was projects like this which would make its stock worth $20 per share and earn $1 per share for that year. At the time these statements were made, the book value of the stock of the defendant corporation was approximately 50 cents per share. The corporation had suffered a net operating loss in excess of $27,000 since August 1, 1960, and had earned from August 1, 1960, through May 31, 1961, only $10,539. Obviously, at the time these statements were made, it was extremely improbable, if not impossible, for the defendant corporation to earn this amount or for its stock to be worth $20 per share at the year's end.

In the letter of May 26, 1961, pp. 2–3, the following paragraph appears:

"Three new Corporations have been added to Electronics Security Corporation as subsidiaries. Publicity Releases effective May 29 should announce this in the newspapers Monday. These companies are as follows:

"EQUITY MANAGEMENT COMPANY—An investment man-

agement company which will manage the portfolio of

"EQUITY RESEARCH OF MINNESOTA—A closed end non-diversified investment company, like Midwest Tech, which will be sold by

"SECURITY SERVICES, INC.— A contractual plan broker-dealer, insurance agency, and high-pressure type sales organization.

"What this means is that Electronics Security Corporation, in addition to being an over-the-counter broker-dealer serving the Twin City area—is also a HOLDING COMPANY now."

These three new corporations were nothing more than hollow corporate shells. They were so insignificant that they never even appeared on the balance sheets of the corporation nor had they ever been in operation according to the testimony of the defendant Miller. They certainly did not make E.S.C. a "HOLDING COMPANY" in any ordinary sense of the term.

 These then are the principal statements and omissions of material facts and practices or course of business upon which the plaintiff relies to prove the violations of Sections 17(a) (2) and 17(a) (3) of the Securities Act. A careful reading of these letters reveals that there are other statements and omissions of a similar nature. In any event, there can be little doubt that it is precisely these kinds of untruths, half-truths, and omissions which were made to induce stock sales and are precisely what Sections 17(a) (2) and 17(a) (3) were enacted to guard against. Therefore, the Court must find that defendants have violated Sections 17(a) (2) and 17(a) (3) of the Securities Act.

 The next violation alleged by the S.E.C. is of Section 10(b) of the Securities Exchange Act of 1934, as amended (15 U.S.C. § 78j(b)) and Rule 10b–6 adopted thereunder (17 C.F.R. 240, 10b–6). Section 10(b) provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

* * * * * *

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

And Rule 10b–6 states that:

"(a) It shall constitute a 'manipulative or deceptive device or contrivance' as used in section 10(b) of the act for any person

"(1) Who is an underwriter or prospective underwriter in a particular distribution of securities, or

"(2) Who is the issuer or other person on whose behalf such a distribution is being made, or

"(3) Who is a broker, dealer, or other person who has agreed to participate or is participating in such a distribution, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, either alone or with one or more other persons, to bid for or purchase for any account in which he has a beneficial interest, any security which is the subject of such distribution, or any security of the same class and series, or any right to purchase any such security, or to attempt to induce any person to purchase any such security or right, until after he has completed his participation in such distribution.
* * * * "

**836**

The basic factual situation underlying this allegation is as follows. On May 15, 1961, the corporation purchased from its Assistant Secretary and wife of the defendant Miller, Mary Nell Miller, 6,692 shares of the corporation's stock at $1.15 per share for a total cost to the corporation of $7,695.80. From May 24, 1961, through June 9, 1961, the corporation sold this stock to the public in a series of 67 transactions for from $2 to $3 per share for a gross trading profit of $9,682. During the same period that the corporation was distributing these shares, it was purchasing for its own account some 5,185 shares of its stock for from $2 to $2.50 per share. In other words, the corporation was taking back its own stock from one of its officers and making a distribution of it while at the same time it was bidding for and acquiring its own stock for its own account in the market. Clearly, these transactions constituted a manipulative or deceptive device or contrivance in violation of Section 10(b) and Rule 10(b)6 for it is obvious that these purchases by the corporation helped to keep the market up while the corporation was making its distribution of its stock, and it is for that reason that the Commission has proscribed this type of conduct.

The last violation alleged by the S.E.C. is of Section 15(c) (1) of the Securities Exchange Act of 1934, as amended (15 U.S.C. § 78o(c) (1) and Rule 15c 1–8 adopted thereunder (17 C.F.R. 240.15c 1–8). Section 15(c) (1) provides:

"No broker or dealer shall make use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security (other than commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange, by means of any manipulative, deceptive, or other fraudulent device or contrivance. The Commission shall, for the purposes of this subsection, by rules and regulations define such

devices or contrivances as are manipulative, deceptive, or otherwise fraudulent."

And Rule 15c 1–8 states:

"The term 'manipulative, deceptive, or other fraudulent device or contrivance', as used in section 15 (c) (1) of the act, is hereby defined to include any representation made to a customer by a broker or dealer who is participating or otherwise financially interested in the primary or secondary distribution of any security which is not admitted to trading on a national securities exchange that such security is being offered to such customer 'at the market' or at price related to the market price unless such broker or dealer knows or has reasonable grounds to believe that a market for such security exists other than that made, created, or controlled by him, or by any person for whom he is acting or with whom he is associated in such distribution, or by any person controlled by, controlling or under common control with him."

There can be little doubt that the representation proscribed by Section 15c 1–8 was made by the defendants. In the letter of May 26, 1961, part of which has been described above, the following sentence appears at p. 1:

"To correct a misunderstanding— *our present stockholders can buy any amount of shares they want*—at market—there is no limit now."

It also appeared from the testimony adduced at the trial from purchasers of defendants' stock that when they purchased it they were led to believe that there was a free and independent market for it, although this was not the fact. The fact is that shortly after the public issue had been sold out, the price of E.S.C. stock, as did the prices of the great majority of local issues then being offered in this area at that time, jumped to $2 per share. However, the defendants were not content to let the price of the stock find its own level in an open

market, but began to principal it. From May 15, 1961, to May 31, 1961, the corporation purchased 9,092 shares of its own stock at a cost of $12,545.80 and sold 3,800 shares for $9,162.50; in the month of June, 1961, the corporation purchased 7,285 shares of its own stock at a cost of $17,856.25 and sold 9,235 shares for $26,191.90; and from July 1, 1961, through July 21, 1961, the corporation purchased 5,756 shares of its own stock at a cost of $15,403.75 and sold 2,586 shares for $7,864.12. Thus, in this period of slightly over two months, E.S.C. purchased 22,142 shares of its own stock at a cost of $45,805.80 and sold 15,621 shares for $43,188.52. Also during this period the defendant Miller caused to be given quotations to the local representative of the National Association of Security Dealers in order to create the impression that in fact an independent market existed for this stock. On the basis of these facts, it clearly appears that at the time the representation that E.S.C. stock was being offered at the market was being made to customers by the defendants, there was no market other than the market being made, created or controlled by the defendants. There can be no doubt that such conduct is violative of Section 15(c) and Rule 15c 1–8. As the Commission stated in Lawrence Rappe (1961) Sec. Ex. Act Rel. No. 6504, p. 4:

"When a broker-dealer engages in the securities business he impliedly represents to customers that they will be dealt with fairly and honestly, that the prices they are charged are, or are reasonably related to, the prevailing market prices, *and that the market is a free and independent market insofar as that broker-dealer is concerned."* (Emphasis added).

Therefore, it convincingly appears that the defendants have also violated Section 15(c) and Rule 15c 1–8 of the Securities Exchange Act.

In conclusion, it is the judgment of this Court that the defendant corporation and Simeon Miller have violated Sections 17(a) (2) and 17(a) (3) of the Securities Act of 1933 and Sections 10(b) and 15(c) of the Securities Exchange Act of 1934 and Rules 10 b–6 and 15c 1–8 adopted thereunder.

 The fact that the defendants have ceased any violations of the Act and its regulations is no bar to the issuance of an injunction. Under all the circumstances, it is fully appropriate for the Court to issue a permanent injunction enjoining these defendants, and each of them, from further engaging in violation of the statutes and rules referred to above. The Court adopts the foregoing as its Findings of Fact, and as Conclusions of Law finds that plaintiff is entitled to an order granting an injunction as prayed for. An order consistent herewith may be presented on ten days' notice. An exception is reserved.