**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,**

v.

**Richard L. BURNS, Defendant-Appellant.**

No. 86–6071.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 1987.

Decided May 1, 1987.

---

Thomas L. Riesenberg, Washington, D.C., for plaintiff-appellee.

Kenneth M. Poovey, San Diego, Cal., for defendant-appellant.

Before WRIGHT and REINHARDT, Circuit Judges, and CARROLL,* District Judge.

EUGENE A. WRIGHT, Circuit Judge:

The district court found that Burns violated numerous securities laws by signing and filing financial statements that contained false or misleading information, 614 F.Supp. 1360. It found also that Burns violated Rule 10b–6 by inducing his officers to purchase the corporation's securities during the distribution. We agree.

FACTS

In 1978, Burns founded Combustion Product Corp. (CPC), an oil and gas exploration company. Shortly thereafter, CPC acquired E–G Joint Venture (E–G), a Texas-based energy company, and, in 1979, Nucorp acquired CPC. Burns became Nucorp's chief executive officer, Chairman, and principal shareholder.

After the acquisition, Nucorp hired Arthur Andersen & Co. to conduct a purchase audit. It revealed that E–G used an accounting practice known as "prebilling," whereby income from sales not yet completed were recognized as current revenues. With prebilling, a customer would place an order for products, some to be delivered immediately, the rest for future delivery. The seller would credit to revenues the amount of the entire order, despite the possibility that future deliveries might never be made and paid for. Arthur

Andersen told Nucorp's financial officers that prebilling was improper. The officers responded by reversing the prebilled entries already in the records.

Thereafter, Nucorp reinstituted prebilling, but discarded the practice again after it created severe bookkeeping problems and forced Nucorp to charge-off millions of dollars in revenue entries.

By this time, Nucorp had issued numerous financial statements with prebilled revenue figures. These included registration statements for debt offerings, and annual and quarterly reports. No financial statement revealed that Nucorp was prebilling.

In October 1981, Nucorp's top management met to discuss, *inter alia,* prebilling. The corporation's chief financial officer stated clearly that prebilling was improper. He recommended that the record books be purged of prebilled revenue entries and the upcoming quarterly report be adjusted to exclude them.

But Nucorp proceeded to file its third quarter report without adjusting the figures to exclude the $10 million in prebilled revenues.

During this period, Nucorp elected to issue new shares of common stock and Burns was active in arranging the issuance. Two days before filing Nucorp's registration statements, he called Wooley, a Nucorp vice-president, and instructed him to borrow $75,000 from a Nucorp subsidiary and use it to purchase Nucorp stock. Wooley complied, buying stock on June 11 and June 12, 1980.

One day before the registration statement became effective, Burns called Cox, president of a Nucorp subsidiary, and instructed him and Wooley to borrow $85,000 from the company and buy Nucorp stock the following day.

The Securities and Exchange Commission filed a complaint for injunctive relief against Burns, alleging that he violated the antifraud [1] and reporting [2] provisions of the

---

* Of the District of Arizona.

1. 15 U.S.C. §§ 77q(a), 78j(b) (1982); 17 C.F.R. § 240.10b–5 (1986).

2. 15 U.S.C. § 78m(a) (1982); 17 C.F.R. §§ 240.13b–20, .13a–1, .13a–13 (1986).

securities laws in connection with the use of prebilling in Nucorp's financial statements, and the manipulation provisions [3] in connection with Nucorp's purchase of its stock. The district court found that Burns acted with scienter with respect to Nucorp's false financial statements and that he thereby violated the securities laws. The district court also found that Burns' instructions to his officers to purchase the stock during a distribution violated Section 10(b) and Rule 10b–6 of the Securities Exchange Act of 1934.

## DISCUSSION

### Prebilling and Fraudulent Financial Statements

The parties agree that prebilling is an improper accounting practice and that Nucorp issued false or misleading financial statements. The issue here is whether Burns acted with scienter when he signed and issued those statements.

█ The court's finding that he acted with scienter is reviewed for clear error. *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 465 (9th Cir.1985).

█ Scienter is a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1977). This mental state is satisfied if the defendant acts recklessly in his fraud. *Shad v. Dean Witter Reynolds*, 799 F.2d 525, 530 (9th Cir.1986). Proof of scienter is often based on inferences from circumstantial evidence. *Id.; Herman & MacLean v. Huddleston*, 459 U.S. 375, 390–91 n. 30, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983).

Burns argues that he lacked this mental state. He contends that, until the October 1981 meeting, he did not know that prebilling was improper or that financial statements containing prebilled revenue figures were false or misleading.

█ Burns was fully aware of what he was doing when he issued the fraudulent financial statements. The Arthur Andersen accounting firm told the corporate officers so as early as 1979. Nucorp nonetheless practiced prebilling intermittently over a period of approximately two years. It led to bookkeeping problems that forced Nucorp to charge off millions of dollars of revenues. It is inherently incredible that, through all of this, Burns did not learn that prebilling was an improper accounting practice.

Even if Burns did not know it until the meeting of Nucorp senior officers in October 1981, he still failed to purge subsequently issued financial statements of prebilled revenues. Although the district court did not include this finding in its final order, we may rely on it, as it is clearly established in the record. *See Smith v. Block*, 784 F.2d 993, 994 n. 4 (9th Cir.1986).

### Rule 10b–6

█ The question whether Burns violated 10b–6 is a mixed question of law and fact and is reviewed de novo. *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

In 1983, the SEC amended Rule 10b–6 with new language defining its scope. Prohibitions Against Trading by Persons Interested in a Distribution, Exchange Act Release No. 21,375, [1983 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 83,326 (Mar. 4, 1983) [hereinafter "Amendments"]. These amendments do not apply here as to events occurring earlier. The question thus involves the scope and substance of Rule 10b–6 in 1980.

The release containing the amendments provides an interpretation of the prior scope of the rule:

[t]o determine whether certain persons were covered by Rule 10b–6 owing to their relationship as an *affiliate* of a distribution participant, the staff has looked to whether a person controls, is controlled by, or is under common control with such participant. In addition, the prohibitions of the rule have been

---

**3.** 15 U.S.C. § 78j(b) (1982) (Section 10(b)); 17 C.F.R. § 240.10b–6 (1980) (Rule 10b–6).

considered applicable to any other *person sharing a special relationship with the distribution participant which would provide that person with an incentive to condition the market* to facilitate the distribution of the offered security.

Amendments at 85,812 n. 23 (emphasis added).

■ Burns comes within this language. As CEO, Chairman of the Board, and largest shareholder, he had a special relationship with Nucorp that gave him an incentive to promote the distribution of the offered securities. Nucorp itself deemed him to be an "affiliate" of the corporation in a "no-action" letter to SEC. *Nucorp Energy, Inc.,* No-Action Letter, Nov. 28, 1981 [Available on WESTLAW, FSEC–NAL database] (available on LEXIS, FedSec File, No-Act Library). Nucorp asked the Commission to grant an exemption to its officers and directors for a future securities offering. *Id.* The letter itself shows Nucorp realized that officers and directors of an issuer were subject to 10b–6 liability.[4]

■ Burns argues that the legislative history of 10b–6 shows that the rule was not intended to include officers and directors. He notes that in 1956 the SEC proposed an amendment to apply the rule explicitly to those persons: "It is proposed to make it clear that officers, directors and persons controlling the issuer or other person on whose behalf the distribution is being made would also be subject to the prohibitions of the rule." Exchange Act Release No. 5415 (Dec. 5, 1956). The amendment, however, was later withdrawn. Securities Act Release No. 4757 (Jan. 22, 1965). This, says Burns, shows clearly the Commission's intent to exclude officers and directors from the scope of 10b–6.

We disagree. It was withdrawn because it was unnecessary and its addition could create other problems. The existing rules were adequate and there was no need for the clarifying amendment. Exchange Act Release No. 7517 (Jan. 22, 1965).

Professor Louis Loss, a leading securities law authority, has written:

[a]lthough this proposal was untimely withdrawn, the Commission's referring to it as a clarifying amendment indicates that the specified classes of persons are considered to be subject to the rule as it stands. The reason this policy was not codified into a rule is understood to have been an objection that it would prohibit officers from exercising or receiving options (although it is in fact the administrative position that will not necessarily violate the rule). Conversely, there may also be a problem under the rule if an officer, director or controlling person is the one making the distribution and the issuer is buying in the market.

Loss, *Securities Regulation* at 3770 (2d ed. Supp.1969) (citations omitted). The legislative history supports the district court's holding.

Additional authority shows the rule's application to officers and directors. In *SEC v. Electronics Securities Corp.,* 217 F.Supp. 831 (D.Minn.1963), the defendant (Miller) was the CEO, Chairman of the Board, and principal shareholder. The corporation purchased shares on its own account during the course of a distribution. *Id.* at 836. The court found Miller *personally* liable for violating 10b–6 and enjoined him and the corporation from further securities violations. *Id.* at 832–36; *see also R.A. Holman & Co., Inc. v. SEC,* 366 F.2d 446 (2d Cir.1966), *amended,* 377 F.2d 665 (2d Cir.1967) (president of broker-dealer firm participating in stock distribution was, along with his corporation, liable for violating 10b–6).

The court in *SEC v. Blinder, Robinson & Co., Inc.,* 425 F.Supp. 468 (D.Colo.1982), said explicitly:

[f]or purposes of Rule 10b–6, the court holds Blinder, as the President and con-

---

**4.** Nucorp's letter stated:

We are requesting an exemption from Rule 10b–6 under the Securities Exchange Act of 1934, as amended, to permit purchases of the Common Stock of Nucorp ... by *members of Nucorp's Board of Directors and its officers* (all of whom may be deemed to be affiliates of Nucorp).

*Id.* (emphasis added).

trolling officer of Blinder-Robinson, liable for the firm's misconduct. The evidence presented at trial shows that the firm's purchase of American Leisure Units and its subsequent market manipulation was either known to Blinder or at his direction.

*Id.* at 477 n. 4.

Although *Blinder* post-dates the events here, it pre-dates 10b–6's 1983 amendments. The *Blinder* court based its language on the interpretation of 10b–6 that existed for Burns. Hence, the courts had assumed, even before the 1983 amendments, that 10b–6 applied to officers and directors participating in a distribution of their corporation's stock.

Burns says that such cases are inapposite because the courts simply extended liability for the *corporation's* activities to the directors and officers. The corporation was *primarily* liable, the officers and directors *secondarily* liable. The difference here, says Burns, is that because Nucorp was never charged with liability, it is improper to charge him with primary liability for acting in his private capacity.

We are unpersuaded. Burns cites no authority for his point. Nothing in the language of 10b–6 or SEC releases related thereto suggested that an officer's or director's liability derived from that of the corporation. *See* 17 C.F.R. § 240.10b–6(a)(1), (3) (1980). Although officers and directors had been found liable for condoning 10b–6 violations, *see Blinder,* nothing prevented the Commission from bringing action against the officer or director individually.

Finally, Burns argues that Rule 10b–6 does not apply because the purchases took place outside the distribution period. On June 11 and 12, and July 14, 1980, Nucorp officers Cox and Wooley purchased Nucorp stock at Burns' instructions. He asserts that none of those purchases occurred during the distribution.

He contends that the June purchases were conducted before distribution began. He argues that the earliest point at which a public offering distribution could start would be the filing of the registration statement. This, he argues, is the only reasonable interpretation of the SEC's releases on the matter and that, because the registration statement was filed two days after these purchases, they were not made during the distribution.

■ But this claim contradicts the explicit language of the release upon which Burns relies. *See* Prohibitions Against Trading By Persons Interested in a Distribution, Exchange Act Release No. 18528 [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 83,104 (Mar. 2, 1982). In it, the SEC stated that a distribution

> may commence not only before a registration statement with respect to those securities has become effective, *but even before such statement has been filed with the Commission.* A distribution commences at the point when the incentive to engage in manipulative conduct is first present. Accordingly, with the respect to the issuer, a distribution generally is deemed to commence at the time that a determination to go forward with the public offering is made.

*Id.* (emphasis added).

Clearly a distribution may start *before* the registration statement is filed if prior to that time there is an incentive to artificially influence the stock's price. Here, that incentive existed when Burns asked his officers to buy the stock. The decision to "go forward" with the public offering must have been made well before June 11 in order to file registration statements on June 14 and begin the offering a month later. That stock was purchased during the distribution and came within the scope of Rule 10b–6.

Burns argues that the July 14 stock purchases by Cox and Wooley were made *after* distribution was completed. He points out that the registration statement had become effective the morning of July 14. Within hours, the entire issue had been sold. It was later that day, after the issue had been sold, that Cox and Wooley bought Nucorp stock. Therefore, says Burns, the purchases did not occur during the distribution and, as such, did not come within 10b–6.

Rule 10b–6 prohibited Burns from attempting to induce any person to purchase "any security which is the subject of such distribution ... until after he has completed his participation in such distribution." 17 C.F.R. § 240.10b–6(a)(3) (1980).

Here, he clearly attempted to induce Cox and Wooley to buy stock that was *the subject* of the distribution. It does not matter that the purchases came after the issue had been sold. So long as the participant attempted to induce purchases of those securities involved in the distribution, and did so before he completed his participation in the distribution, the attempt to induce comes within the scope of Rule 10b–6. We so find here.[5]

CONCLUSION

The court did not err in finding Burns violated Rule 10b–6. The rule in 1980 applied clearly to officers and directors, and his inducement of his officers took place during a stock distribution. Indeed, Burns would be liable even under the current version of the rule.

Neither did the court err in finding that Burns acted with scienter in issuing financial statements containing pre-billed revenues. The evidence leads to the inference that he knew of prebilling's impropriety while condoning its practice. He admits learning of this impropriety in October 1981 and does not contest the claim that Nucorp financial statements issued thereafter contained prebilled revenues.

AFFIRMED.

---

5. This holding is limited to the timing of the acts that constitute a Rule 10b–6 violation. The parties do not argue whether Rule 10b–6 carries a scienter requirement. Hence, we do not review it.