**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss is **GRANTED**. [Doc. 9]

An Order of Dismissal shall accompany this Memorandum and Order.

### ORDER OF DISMISSAL

In accordance with the Memorandum and Order entered this date and incorporated herein,

**IT IS HEREBY ORDERED** that this case is DISMISSED WITHOUT PREJUDICE.

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Hahn TRUONG, Hieu Truong, Hen Truong, Nina Vinh, Mike Pirbazari, and Christopher Nguyen, Defendants.**

**No. CIV. 98–21137SW(EAI).**

United States District Court, N.D. California.

April 12, 2000.

Finola G. Halloran and John Yun, Securities & Exchange Commission, for plaintiff.

Jared L. Kopel and Lawrence Hing, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Daniel Bergeson, Bergeson & Eliopoulos, San Jose, CA, Jahan P. Raissi, Shartsis Friese & Ginsburg, San Francisco, CA, Hoa Phu Truong, Law Offices of Hoa Phu Truong, Fountain Valley, CA, for defendant.

## ORDER RE: DEFENDANT'S MOTIONS FOR SUMMARY JUDGEMENT

SPENCER WILLIAMS, District Judge.

## I. INTRODUCTION

Defendants Hanh Truong ("Hahn"), Hieu Truong ("Hieu"), Hen Truong ("Hen"), and Christopher Nguyen ("Nguyen") move for summary judgment pursuant to Federal Rule of Civil Procedure 56 in this civil enforcement proceeding by the Securities and Exchange Commission ("SEC") for violations of federal securities laws prohibiting insider trading.[1]

The question presented in these motions is whether the SEC has presented sufficient evidence of insider trading to warrant moving forward with a jury trial as to each Defendant. Defendants argue that the SEC has not presented sufficient probative evidence and is basing its charges on "mere suspicions." The SEC concedes that the evidence is not overwhelming, but urges that the evidence is more than sufficient for a reasonable jury to infer that Defendants possessed and traded upon material non-public information.

Having considered the arguments and evidence presented in the briefing and at the hearing conducted on January 19, 2000, the Court now rules as follows.

## II. FACTUAL BACKGROUND

Defendants are accused of violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"), and Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), prohibiting fraudulent conduct in the offer or sale of securities. The undisputed facts are summarized below.

### A. Molecular Dynamics, Inc.

During the relevant period, Molecular Dynamics, Inc. ("MDI") was a developer, manufacturer, and marketer of high performance image acquisition and analysis instrumentation for the life-science research market. MDI failed to meet market expectations for the quarters ended September 30, 1993 and January 2, 1994. In a press release conveying results for the third quarter ("Q3") of fiscal year 1993 ("FY93"), ended September 30, 1993, MDI predicted sales would weaken. The press release, issued on October 21, 1993, quoted MDI's president as saying:

"While the domestic market was reasonably strong in the third quarter, markets in Europe and the Pacific Rim continued to perform below expectations and we have recently begun to see some weakness in the United States. We believe this pattern may continue through

1. Defendants Nina Vinh and Mike Pirbazari have been dismissed.

the end of 1993 and into the first half of 1994. After considering several factors affecting our business, we believe that our growth rate will moderate over the next several quarters as compared to prior periods."

An MDI press release issued January 31, 1994 reporting on fourth quarter ("Q4") of fiscal year 1993 ("FY93") and FY93 results, stated that sales and income for Q4 FY93 increased compared to the prior year. It also quoted MDI's president as saying that the results "were encouraging in view of weak economic conditions in several major markets." The release also disclosed that MDI was negotiating for a new source of reagent kits for one of its major products and that there might be an announcement during the quarter.

MDI experienced a weakness in orders and revenues in January, February, and March of 1994. Although orders for MDI's products were often weak during the first two months of a quarter, the pace of sales often accelerated during the final month of a quarter. Sales in March 1994 failed to make up for the slow pace of orders in January and February 1994, however. The first quarter of FY94 ended April 3, 1994, and MDI's failure to meet revenue expectations was publicly announced April 6, 1994. That same day, MDI also announced it had reached an agreement with a supplier of reagent kits. The following day, April 7, MDI shares closed down 38%, from $10.00 per share to $6.125 per share.

## B. Hahn Truong

Defendant Hahn Truong was the manager of a software group in the engineering department of MDI. Hahn joined MDI as a software engineer in 1988. In 1993, Hahn became a software manager and re-mained in that position until leaving MDI in 1997. During 1994, Hahn reported to Russell Singleton ("Singleton"), vice president of Engineering. Hahn's was not a senior staff position. He was not made privy to confidential sales and financial information in the normal course of his duties. Hanh sometimes attended senior staff meetings, but typically his presence was limited to technical presentations and he was not present for financial discussions.

### 1. Stock trading

Hahn was an active stock trader with a long history of trading stock in MDI and other companies. He opened a brokerage account with McLaughlin Capital ("McLaughlin") in February 1994 after his broker moved to that firm. Hahn also opened three accounts at Hambrecht & Quist ("H & Q") just before MDI went public in February 1993 for his trading in MDI, including exercising stock options. On February 1, 1994, Hahn held 5,000 shares of MDI stock in his H & Q account and 3,000 shares in the account he moved to McLaughlin. On February 8, 1994, Hahn exercised vested options to purchase an additional 11,000 shares of MDI stock. The exercise price was $.25 per share for 10,250 shares, and $.50 per share for 750 shares. Hahn used these shares as collateral to purchase 14,000 MDI shares in the open market at $12 per share in mid-February 1994.

Truong states that he intended to sell all of his MDI stock prior to the March 20, 1994 close of MDI's trading window for the quarter.[2] Hahn's trading during the March 1994 timeframe can be summarized as follows.

At some point between March 10 and March 15, 1994, Hahn met with Stephen Bennion, MDI's Chief Financial Officer, to ask if he could execute a trade[3] despite a

---

**2.** MDI barred trading by its employees in MDI stock between two weeks from the end of a quarter until the public earnings release. The trading "blackout" for the April 3, 1994 quarter commenced on Monday, March 21, 1994.

**3.** The precise nature of the question posed by Hahn is in dispute.

lock-up affecting some employees. After conferring with counsel, Bennion informed Hahn that he was not affected by the lock-up.

On Thursday, March 17, 1994, Hahn called H & Q to sell 10,500 shares. Of these shares, 5,000 sold at $11.20 per share, 2,000 sold at $11.75 per share, and 3,500 sold at $11.40 per share. This sale was Hahn's third largest MDI transaction by market value.

On Friday, March 18, 1994, Hahn sold 5,000 MDI shares for $10.50 per share, 4,000 shares for $10.70 per share, 5,000 shares for $11.20 per share and 5,500 shares for $10.69 per share through his H & Q accounts. (H & Q also put in a sell order for 779 shares on March 18. Because Hahn only had 729 shares left to sell, that transaction went through, for the corrected amount, on March 21 at $10.69 per share.) The 19,500 shares Hahn sold on March 18 represented 29.6% of MDI's trading volume for that day. It was also Hahn's largest MDI transaction.

On Monday, March 21, 1994, 3,000 MDI shares in the McLaughlin account were sold. Although this trade occurred one day after the close of the trading window, Hahn states that he placed a limit order to sell the shares during the prior week, on March 17 or 18. Hahn's broker at McLaughlin believes he considered this a market order. These shares sold for $9.375 per share.

## 2. Negative financial information at MDI in February and March 1994

### a. General indications of weak sales at MDI

#### i. *February 16, 1994 supervisors' meeting*

The SEC contends that Hahn attended a supervisors' meeting on February 16, 1994, at which the company president made a presentation entitled "State of the Company." A slide from that presentation included a bullet point stating: "Order Re-ceipts Weak Worldwide." Hahn does not recall attending this meeting, but the SEC has provided the testimony of two employees who contend that Hahn was probably at that meeting. MDI employee Michael Miller testified that order shortfall and market dynamics were generally described. There is no evidence that specific numbers or sales projections for Q1 FY94 were discussed. At the meeting, CFO Bennion also gave a report that analysts expected 40 percent growth, or revenues in the $53 to $56 million range.

#### ii. *Low activity in the manufacturing department*

Hahn, as a software engineer, did not have a day to day relationship with MDI's manufacturing department, but MDI was not a very large company and an employee could walk through the manufacturing department at any time. Singleton testified that the number of MDI products on the floor at any time during the quarter could provide an employee with an indication of sales activity. In addition, a white board in a conference room in the manufacturing department indicated which unit was being shipping to which customer. Singleton testified that an employee viewing the white board could determine how many products had shipped and how many were without orders. He commented that engineers at MDI could "intuit ... what they perceived the movement was on the manufacturing floor, and they could draw conclusions, correct or incorrect, based on that." Employees understood that shipment information on the white board was confidential.

#### iii. *General cost-cutting measures*

At some point prior to March 16, it appears that MDI's president Jay Flately asked his senior staff to cut their respective departments' expenses. On March 16, 1994, at 10:32 a.m., Flately sent an e-mail to senior managers, including Singleton, to emphasize that the staff was to take MDI's expense control program seriously and to

eliminate all discretionary spending. The e-mail stated:

I wanted to reiterate and clarify my interpretation of our expense control program. My sense is that it is not being taken as seriously as it needs to be . . .

The plan we discussed was to eliminate all discretionary spending. To me this means

* NO TEMPS
* NO COMPUTER UPGRADES OR ACCESSORIES, MODEMS, ETC
* NO SOFTWARE PURCHASES
* NO UNNECESSARY TRAVEL
* NO SUBSCRIPTIONS THAT ARE NOT CRUCIAL [. . .]
* NO SEMINARS
* PROBABLY NO MORE BREAKFAST SUPPLIES FOR ENGINEERING AND MARKETING MEETINGS
* NO LUNCHES WITH CONSULTANTS, SCIENTISTS, CANDIDATES, ETC. UNLESS ABSOLUTELY NECESSARY FOR SCHEDULING REASONS
* ETC, ETC.

The e-mail continued: "I don't want to be the policeman on this, it needs to be managed by the Staff at the department level. Thanks in advance for your cooperation." The language of the Flately e-mail indicates that an expense control program of some sort was in place prior to March 16, 1994. However, the SEC has not offered specific evidence that the expense control program was known to employees at Hahn's level or that working conditions at MDI changed before March 22, 1994 in a way that would reflect the existence of an expense control program.

Singleton held an Engineering Managers meeting on March 22, 1994 from 10:15 to 10:45 a.m. On the agenda under "New Business" was an "Update from Sr. Staff Meeting," and a discussion about "Expense Control." Singleton testified that he would have disclosed a hiring freeze decision at this meeting, and would have discussed Flately's March 16th e-mail at this meeting. Hahn attended this meeting, but states that he has no recollection of any discussion regarding the Flately March 16 e-mail or the substance of the e-mail.

### iv. *Chill on new hires*

Early in March 1994, Hahn expected to add a new software engineer to his team. By March 10, 1994 senior staff determined that MDI had to be very aggressive in managing headcount. On that date, the Human Resources department held up the hiring paperwork for the software engineer. There is no evidence that Hahn knew of this action until March 22, 1994, when Singleton addressed his engineering managers.

During its weekly meeting held March 21, 1994, MDI senior staff decided to freeze headcount. The Human Resources report for March 20, 1994 shows nine open requisitions for new hires, including the requisition for a software engineer working for Hahn. The Human Resources report for the following week, March 27, 1994, had just one open requisition, with the software engineer position no longer being shown.

### v. *General discomfort*

Singleton testified that "generally people were aware that we weren't getting orders and were aware we weren't shipping product out the door. But the exact numbers and magnitude are not available. I'd say there was general discomfort." This discomfort apparently began in mid-February 1994. Singleton testified that he learned of a general discomfort among MDI employees from his engineers. Hahn was one of his reports, but Singleton can not recall whether Hahn had been among the people to communicate this general discomfort to him.

### b. **Specific documents referencing weak sales and revenues**

#### i. *Monthly financial report*

MDI's controller provided senior managers with monthly financial reports. The

January 1994 financial report was distributed on February 24, 1994. It indicated that MDI's January sales were $1,125,000 versus average monthly sales of $3,238,000 in the previous quarter. The January Report also noted: "Low sales across all product lines combined with below-normal margins, generating a loss in January." The February 1994 financial report was distributed on March 18, 1994. It stated that sales were $1,422,000 versus average monthly sales of $3,238,000 in the prior quarter and that there was a year to date operating loss of $2,013,000.

There is no evidence Hahn saw these reports, which were considered confidential. CFO Bennion, for example, testified that he kept his reports locked in his desk. The SEC states in a footnote that not all recipients of financial documents kept them in locked bins. "As a result," states the SEC, "Hahn may have obtained information about Molecular's first quarter finances by looking for such information or by viewing the information in an open cubicle." Plaintiff's Lead Opposition to Summary Judgment at 14:26–29.

ii. *Weekly flash reports*

MDI's weekly Flash Reports indicated quarter to date product shipments versus the quarterly plan shipment target. The reports were distributed to senior management and were considered confidential. The reports issued in Q1 FY94 showed shipments were consistently behind plan. On March 14, 1994, CFO Bennion sent a memo to MDI's vice president for sales indicating that he was concerned about low orders for the month of March. Bennion wrote: "Richard, given the fact that we depend on a large third month to make our quarterly numbers, I am concerned after seeing this mornings [month to date] orders with a little less than three weeks remaining." There is no evidence Hahn saw this memo or that he saw any Flash Report during the quarter.

A March 16, 1994 "Build Plan Memo" addressed to seven senior staff members

and marked "company confidential" indicates that actual sales trailed behind forecasted sales. There is no evidence Hahn saw this memo.

iii. *1993 Form 10–K Annual Report*

On March 15 and 16, 1994, MDI's personnel and outside counsel were working on the company's 1993 Form 10–K Annual Report. A draft of the Form 10–K was distributed to MDI's directors, officers, 5% shareholders and auditors on March 15, 1994. The Form 10–K discussed current business and financial developments.

The SEC states that:

Hahn had the opportunity to learn about the Form 10–K, and its contents, around March 16. Telephone logs indicate that he was at Molecular at least until 7:30 p.m. on that evening, when Sarah Staff was also working late [. . . .] Because Molecular's personnel worked in open cubicles, there was the physical opportunity for Hahn to overhear conversations of persons working on the Form 10–K or to see documents—such as monthly financial reports, flash reports and build plans—that were left out or not locked up.

Plaintiff's Lead Opposition to Summary Judgment at 14:16–21.

**C. Hieu Truong**

Hieu Truong is Hahn's brother. Hieu has a long history of stock trading, and at the time of the events giving rise to this lawsuit spent approximately two hours each night studying news, charts, and other information about stocks and the stock market. Hieu had two computer-based information services catering to professional stock traders at his home. Hieu held an account at Fidelity Investments ("Fidelity") and an account at H & Q, which he opened in February 1993 to purchase MDI shares during its initial public offering.

In early 1994, Hieu had a business where his brother Hen also worked. The two of them would frequently discuss the

stock market and investments. Hen frequently followed Hieu's trades. Hieu was generally a short-term trader.

Hieu frequently traded in MDI. Beginning in October 1993 and continuing for over four months into early March 1994, Hieu accumulated over 16,000 MDI shares, at an average price of approximately $11.77 per share.

On the evening of March 16, there were three telephone calls between Hahn's office and Hieu's home. The first is from Hahn's office to Hieu's home, for about one minute. The second is from Hieu's home to Hahn's office, for 2.7 minutes. The third is a one-minute call from Hahn's office to Hieu's home. The SEC has not provided direct evidence that Hieu and Hahn spoke during these calls.

On March 17, 1994, Hieu sold 5,000 MDI shares for $11.25 per share through his Fidelity account. On March 18, 1994, MDI cancelled a scheduled appearance at an analysts' conference sponsored by Cowen & Co. Some investors, including Hieu, interpreted the nonappearance as a negative indication.

On March 21, 1994, the next trading day, Hieu sold 4,000 MDI shares for $9.75 per share through his Fidelity account. Hieu also short sold[4] 1,500 shares for $9.25 per share, another 1,500 shares for $9.50 per share, and another 4,000 shares for $9.00 per share through his Fidelity account. There is a call from Hahn's office to Hieu at 10:41 a.m. Following that call, Hieu sold 7,500 MDI shares and short sold another 2,000 shares for $9.50 per share through his H & Q account.

On March 22, 1994, Hieu sold 800 MDI shares for $10.75 per share through his Merrill Lynch account.

On March 23, Hieu short sold 1,500 MDI shares for $10.19 per share through his H & Q account.

On April 7, 1994, Hieu purchased 7,000 MDI shares at $6.25 per share to cover the short position at Fidelity, and derive a $20,375 profit. Hieu purchased another 3,500 shares at $5.80 per share to cover his short position at H & Q, and derive a $13,985 profit.

## D. Hen Truong

Hen is also a brother of Hahn. He graduated from Golden Gate University in the mid-1980s with a bachelor's degree in business administration and accounting. Hen worked for two years at his own real estate development company. Hen then worked at Global Financial Services ("Global") as a mortgage loan consultant. Following the murder of his supervisor in 1989, Hen left Global and relocated at the recommendation of federal prosecutors. Hen subsequently appeared as a government witness in several criminal cases involving organized crime. He returned to the San Francisco Bay Area in 1993. Hen then worked with Hieu until 1995 or 1996 as a mortgage and financial consultant.

Hen began trading stocks in early 1993. On February 5, 1993, Hen opened a brokerage account at H & Q to purchase MDI shares. In October 1993, Hen opened an account at Fidelity.

On March 17, 1994, Hen sold 3,000 shares of MDI at $11.25 per share through his Fidelity account. On March 18, Hen learned of MDI's cancellation of the analsyst's conference, and considered this development to be bad news.

On March 21, 1994, Hen sold 3,000 MDI shares for $9.50 per share, sold another 2,000 shares for $9.25 per share and short sold yet another 2,000 shares for $9.50 per share through his H & Q account. Hen also short sold 2,000 MDI shares for $9.25 per share through his Fidelity account. Pursuant to a fifty-fifty profit sharing agreement, Hen used the Fidelity account

---

**4.** A "short sale" is the sale of a stock an investor borrows, but does not own. The investor thereafter "covers" the sale by purchasing replacement shares on the open mar-

ket. Just as the purchase of a stock seeks to take advantage of an anticipated rise in the stock's price, a short sale seeks to take advantage of an anticipated decline in price.

of Ms. Kim Oanh Dang to sell 1,500 MDI shares at $10.25 per share and to short sell another 1,000 shares at $9.50 per share.[5]

On March 22, 1994, Hanh telecopied a letter to H & Q instructing it to wire transfer $120,000 from his H & Q account to his Wells Fargo Bank checking account. On March 23, 1994, Hen opened a new account at McLaughlin. Hanh had Wells Fargo Bank issue a cashier's check for $80,000, dated March 30, 1994, payable to "Correspondent Services Corp.," the clearing firm for McLaughlin, for Hen's account. Hen used the proceeds to sell short MDI stock. On March 23, 1994, Hen short sold 10,000 MDI shares for $10.125 per share. The value of that short sale approximates Hen's annual income and represents nearly half of his net worth. On March 24, 1994, Hen short sold another 5,000 MDI shares at $10.25 per share. In all, Hen short sold $152,000 in MDI shares in the new McLaughlin account. The short sale on March 23, 1994, was Hen's largest market transaction by market value for the period February 1993 [6] through April 6, 1994. The March 24, 1994 short sale was Hen's third largest market transaction by market value for that period.

On April 9 and 15, 1994, Hen wrote four separate checks drawn on his wife's Home Savings of America account to Hanh totaling $110,000. On the face of two of the checks the words "repaid advances" have been handwritten in the memo section of the check. On the two other checks, the words "repayt of adv" have been handwritten in the memo section of the check.

In June 1994, the National Association of Securities Dealers, Inc. informed MDI about an inquiry into trading in the securities of MDI.[7] On August 15, 1994, Hen had Hanh sign a note and deed of trust. This deed of trust was recorded on December 17, 1997.

### E. Christopher Nguyen

Nguyen is a friend of Hahn's. At Hahn's recommendation, Nguyen opened his first brokerage account at H & Q in February 1993 to purchase MDI shares during the initial public offering. Nguyen then opened a brokerage account at Charles Schwab & Co. ("Schwab") in March 1993. Nguyen did most of his trading through the Schwab account.

On March 22, 1994, Nguyen sold 3,000 MDI shares for $10.75 per share at 11:58 a.m. through his Schwab account.

On March 23, 1994, Nguyen short sold 2,300 MDI shares for $10.25 per share through his Schwab account. That was his first short sale of a company's stock. Telephone records for Nguyen's residential telephone indicate that on March 23, 1994, at 8:37 a.m., a call was made from Nguyen's telephone number to Hanh Truong's extension at MDI. This call was reflected on the billing statement as approximately 1 minute.

On March 24, 2994, Nguyen short sold 2,000 MDI shares for $10.25 per share in his Schwab account. Hahn provided Nguyen with a $15,000 check from his Wells Fargo Bank account on that day.

Nguyen covered half of his short position at Schwab on April 28, 1994, by purchasing 2,150 MDI shares at $6.00 per share and covered the remainder of his short position on June 24, 1994, by purchasing 2,150 shares at $6.50 per share for a $17,200 total profit.

### III. LEGAL STANDARDS

#### A. Section 10(b) of the Securities and Exchange Act of 1934

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any

---

5. When combined, Hanh's, Hieu's, and Hen's sales and short sales represented 24.10% of MDI trading volume on March 21.

6. MDI's initial public offering was in February 1993. Hen engaged in substantial trading in MDI stock throughout 1993.

7. According to Hahn, the investigation and litigation of the Defendants' trading has lasted about five years, and the SEC has taken 45 depositions and has reviewed some 35,000 pages of documents.

person purchasing or selling securities "[t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Pursuant to that Act, the Commission has prohibited, among other things, the omission of "a material fact necessary in order to make [ ] statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5 ("Rule 10b–5"). This rule imposes upon corporate insiders a duty to disclose material information concerning their company's stock or abstain from trading in it. *See Dirks v. Securities & Exchange Comm'n*, 463 U.S. 646, 653, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *Securities & Exchange Comm'n v. Soroosh*, 1997 WL 487434, *2 (N.D.Cal. Aug.5, 1997) (Walker, J.), *aff'd* 166 F.3d 343 (9th Cir.1998) (table).

 In order to establish an "insider trading" violation of Section 10(b) and Rule 10b–5, the SEC must show that a defendant is a corporate insider who purchased or sold securities while in possession of material, non-public information, and acted with scienter. *See Dirks*, 463 U.S. at 653–54, 103 S.Ct. 3255; *Soroosh*, 1997 WL 487434 at *2. "Materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Securities & Exchange Comm'n v. Fehn*, 97 F.3d 1276, 1289 (9th Cir.1996) (internal quotations omitted). The issue of materiality may be regarded as a mixed issue of law and fact. *See TSC Indus. Inc. v. Northway Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Where reasonable minds can differ over whether information is material, the court should not grant summary judgment on the issue. *See id.*

 Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Aaron v. Securities & Exchange Comm'n*, 446 U.S. 680, 686 n. 5, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).

The Ninth Circuit has interpreted the scienter element of Rule 10b–5 and the "manipulative or deceptive" practices element of Section 10(b) of the 1934 Act to require that the government prove that the trader actually *used* the material non-public information in formulating and consummating a trade. *See U.S. v. Smith*, 155 F.3d 1051, 1067–69 (9th Cir.1998). "[T]he government may not rest upon a demonstration that the suspected inside trader bought or sold while in possession of inside information; rather, it must, at a minimum, prove that the suspect used the information in formulating or consummating his trade." *Id.* at 1070 n. 28. In *Securities & Exchange Comm'n v. Adler*, the Eleventh Circuit held that when a trader buys or sells securities while in the possession of material non-public information, courts should employ an evidentiary presumption of a "strong inference" of use, at least in the context of a civil enforcement proceeding. *See* 137 F.3d 1325, 1337 (11th Cir.1998). The court adopted the "strong inference" as a tool to assist plaintiffs with the problems of proof that are inherent when a party has the burden to prove a particular state of mind. *See id.* at 1337–38. The Ninth Circuit in *Smith* held that the "strong inference" rule did not apply in criminal prosecutions for insider trading, but declined to determine whether the presumption applies in civil enforcement proceedings. *See Smith*, 155 F.3d at 1069, 1069 n. 27.

*Smith* recognized that causation or use may be inferred from circumstantial evidence. *Id.* at 1069 ("Any number of types of circumstantial evidence might be relevant to the causation issue"); *see also Securities & Exchange Comm'n v. Burns*, 816 F.2d 471, 474 (9th Cir.1987); *Securities & Exchange Comm'n v. Moran*, 922 F.Supp. 867, 890 (S.D.N.Y.1996). The material non-public information need not be the sole factor in a decision to buy or sell, but must be a "significant factor." *Smith*, 155 F.3d at 1070 n. 28.

The SEC bears the burden of proof to show that the defendants traded based on knowledge of material nonpublic information. *See Securities & Exchange Comm'n v. Musella,* 578 F.Supp. 425, 440 (S.D.N.Y. 1984). The standard of proof in a civil case such as the present one is preponderance of the evidence. *See Moran,* 922 F.Supp. at 891. This standard of proof applies even where the SEC bases its case on circumstantial evidence. *See id.* at 890.

■ The Supreme Court holds that a tippee's duty to disclose material information or abstain from trading "is derivative from that of the insider's duty," and thus a tippee is only liable under § 10(b) or Rule 10b-5 from trading on the basis of material non-public information if the inside tipper breached a fiduciary duty in disclosing to the tippee. *See Dirks,* 463 U.S. at 662, 103 S.Ct. 3255.

### B. Section 17(a) of the Securities Act of 1933

■ Section 17(a) of the Securities Act of 1933, codified at 15 U.S.C. § 77q(a), has terms similar to Rule 10b-5, but applies to the "offer or sale" of securities, and not to purchases of securities. The statute provides:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement or material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Although the standards for liability under section 17(a) are generally the same as those under Rule 10b-5, the Supreme Court has found that the language of subsections (2) and (3) cannot support a scienter requirement. *See Aaron v. Securities & Exchange Comm'n,* 463 U.S. 646, 696, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983).

### C. Summary Judgment

■ Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted if pleadings, depositions, answers to interrogatories, admissions on file, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Where, as here, the plaintiff bears the burden of proof, a defendant seeking summary judgment need only show that there is an absence of evidence to support any element of the plaintiff's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Courts must grant summary judgment if the nonmoving plaintiff fails to make a showing sufficient to establish the existence of an element which is essential to his case and upon which he will bear the burden of proof at trial. *See id.* If the nonmoving plaintiff fails to make such a showing on any essential element of the case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548. In ruling on a motion for summary judgment, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could

reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.[8]

## IV. DISCUSSION

The SEC contends that Hahn came into possession of material non-public information about MDI's weak Q1 FY94 sales on or before March 16, 1994, that he conveyed this information to Hieu on the evening of March 16, 1994, that Hieu tipped Hen around that same time, and that Hahn tipped Christopher Nguyen on or before March 21, 1994.

### A. Hanh Truong

The source of greatest dispute in these motions is the question whether the SEC has offered sufficient evidence on which a reasonable jury can infer that Hahn was in possession of material non-public information at the time he sold his stock. The parties debate what type of evidence the SEC must produce to warrant an inference by a reasonable jury that Hahn possessed material non-public information. Hahn maintains that "the SEC must be able, *a fortiori*, to identify the particular information [Hahn] allegedly obtained."[9] Hahn argues that the burden to identify specific

pieces of material non-public information arises out of the "use" requirement articulated in the *Smith* case.[10] The SEC, in contrast, argues that Hahn's "suspicious trading" in itself warrants an inference that he possessed material non-public information.

Suspicious trading by itself cannot suffice to warrant an inference that an alleged tipper, the first link on the information chain, traded on the basis of material non-public information. Although in *Adler* the 11th Circuit stated that "an inference of possession of inside information" *by a tippee* could "arise from the timing of a sale," *Adler*, 137 F.3d at 1341, the court had already established that the alleged tipper indisputably possessed material information about a potential accounting fraud perpetrated by corporate executives, see *id.* at 1331. Allowing the SEC to tell a jury that "because the tipper's trading was suspicious, the tipper must have possessed some material nonpublic information," would relieve the SEC of its burden to identify the information, prove its materiality, and prove possession and use by the tipper. Moreover, although the SEC may prove that a defendant possessed material

---

**8.** The parties dispute how the Court should evaluate circumstantial evidence in the context of these motions. Defendants argue that in a case based on circumstantial evidence, the SEC is required to provide sufficient probative evidence excluding the possibility of innocent conduct. They also maintain that summary judgment is required where "circumstantial evidence provides equally plausible, innocent explanations of the defendants' conduct." To support this view of the legal standard, they cite to *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 219–30, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 595, 597, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *Monsanto v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 763–64, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

Defendants read *Brooke Group* and *Matsushita*, cases involving accusations of predatory pricing conspiracies, too broadly. The Supreme Court in both cases emphasized the difficulties overcoming a motion for summary

judgment in lawsuits involving allegations of predatory pricing schemes because such schemes are inherently implausible. *See Brooke Group*, 509 U.S. at 227–29, 113 S.Ct. 2578; *Matsushita*, 475 U.S. at 595, 106 S.Ct. 1348. In contrast to predatory pricing schemes, the motivation behind insider trading, generally speaking, is clear: to profit from non-public knowledge about how a stock is likely to perform. Similarly, the *Monsanto* case involved an evidentiary standard in an antitrust action that bears little resemblance to the present action. The Court was concerned about the measure of proof required with respect to allegations of price-fixing. *See Monsanto*, 465 U.S. at 760–64, 104 S.Ct. 1464. In sum, the Court does not agree that the somewhat higher standard of proof employed in these cases applies to the present case involving allegations of insider trading.

**9.** Motion of Defendant Hahn Truong for Summary Judgment at p. 9.

**10.** *See id.* at pp. 9, 12.

nonpublic information through the use of circumstantial evidence (beyond alleged "suspicious" trading), the Agency may not rest on evidence that would require a jury *to speculate* that the defendant possessed that information. Courts stress that the SEC may not base insider trading actions on strained inferences and speculation. *See, e.g., SEC v. Goldinger,* slip op., CV–91–3445 JMI (C.D.Cal. May 12, 1995), *aff'd,* mem. 106 F.3d 409 (9th Cir.1997). "The summary judgment tool filters out cases in which plaintiffs rely entirely upon conclusory assertions and speculative allegations to state a claim for relief. After a respectable period of time for discovery through interrogatories, requests for admissions, requests for the production of documents, and depositions, reliance upon pure speculation is unacceptable. Plaintiffs are required to garner either direct or circumstantial evidence to back upon their legal claims." *Dominguez v. Eli Lilly and Co.,* 958 F.Supp. 721, 726–27 (D.Puerto Rico 1997).

At oral argument Hahn also argued that the SEC's burden included showing that the information Hahn allegedly possessed specifically indicated that MDI "would miss its sales targets by 20 percent," that MDI would report a loss for the quarter ended April 3, 1994, and that the next quarter sales would be substantially below expectations. While the SEC has the burden to identify the facts allegedly possessed by the trader, its burden is to demonstrate that there is a substantial likelihood that a reasonable investor would consider the alleged non-public information important in deciding how to invest. A fact is material "if there is a substantial likelihood that a reasonable [investor] will consider it important in deciding how to [invest]." *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In other words, in order to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the 'total mix' of information made available."

*Id.* at 231–32, 108 S.Ct. 978; *Smith,* 155 F.3d at 1064. Accordingly, the SEC need not show that Hahn knew that MDI would "miss its sales targets by 20 percent," but it must show that Hahn possessed information making it likely that MDI would fall behind expectations. As Judge Walker stated in *Soroosh:* "Even without knowing exactly how great an effect the news [of a delay of a significant product] would have on earnings or when it would affect the share price, the reasonable trader would know that the existence of a significant delay shaded the odds in favor of a short position." *Soroosh,* 1997 WL 487434 at *12–13.

### 1. Possession of Material Non-public Information Prior to March 22, 1994

█ The SEC has failed to produce direct or circumstantial evidence that Hahn possessed material non-public information prior to March 22, 1994. With regard to the particular internal memoranda and reports, such as the Flash Reports, the Financial Reports, the draft Form 10–K, or Flately's expense control e-mail to senior staff, the SEC has failed to provide any evidence on which a reasonable juror could conclude that Hahn saw or possessed them. The SEC contends that Hahn "had access" to these documents, but does not deny that his access was the same as any other MDI employee. As Hahn pointed out in oral argument, "access to documents" means essentially that Hahn worked in an office with open cubicles and had routine interactions with senior management. With reference to the draft of the Form 10–K, the SEC notes that Hahn was working late the same evening that the company controller was working late. But the SEC failed to adduce evidence that Hahn was seen lurking around the controller's office or was engaged in any other behavior which would raise some questions about whether he overheard some discussions of confidential financial information. A reasonable jury cannot

conclude that the mere open-cubicle environment of a corporation could give rise to an inference of possession, otherwise, as argued by Hahn at oral argument, "anyone who works in an office with open cubicles, like virtually everyone in Silicon Valley, and who has merely normal professional relationships with senior management must be considered to have 'access to confidential information' for insider trading purposes."[11] Moreover, all the MDI executives who had copies of the confidential memos denied under oath giving Hahn information about the financial shortfall in Q1 of FY94.

In short, a finding that Hahn possessed any particular document would require speculation on the part of a jury. Despite many years of investigation, including dozens of depositions, the SEC failed to garner direct or circumstantial evidence that Hahn possessed material non-public information prior to March 22, 1994. The evidence of possession is so tenuous that it would require a jury to speculate, for example, that Hahn rifled through papers hidden in senior staff members' offices or to speculate about the contents written on the white board in manufacturing.

In contrast, in *Soroosh*, the SEC had provided specific evidence that the business woes at issue were known not only by senior staff but by an entire corporate division of approximately 250 people. *Soroosh*, 1997 WL 487434 at *12–13. There was also direct evidence that defendant Soroosh was aware of the product delay at issue and its potential impact on the financial condition of the company. *See id.* at *13. By contrast, the SEC here alleges that only nine MDI employees possessed information that the quarter would be poor. None were close to Truong, and all denied discussing financial information with him.

With regard to the February 16, 1994 senior staff meeting, MDI senior staff uniformly testified that it would have been too early in the quarter to project that the

quarter would turn out poor. Moreover, MDI had disclosed late that previous year that market conditions were weak and a moderation in growth was to be expected.

The SEC argues that Hahn could have ascertained that sales fell behind plan by witnessing the dearth of activity in the manufacturing department. Although the manufacturing slowdown appears to be somewhat analogous to the delayed product release at issue in *Soroosh*, there are two fatal shortcomings. First, the SEC provided no evidence that Hahn saw the white board or ventured over to the manufacturing department in mid-March 1994. Second, and more important, the SEC provides no evidence about the information written on the white board as of March 16, 1994. The evidence—that activity in manufacturing was slow and that the white board indicated which unit was being shipped to which customer—lacks specificity required for a finding of materiality by a reasonable jury. The SEC has not shown how this vague information could have altered the "total mix" of information available to investors, especially in light of the fact MDI had warned investors of a slowdown in sales for the quarter.

The SEC has provided no evidence that Hahn knew of a chill on hiring engineers or other employees as of March 16, 1994. Moreover, assuming Hahn knew of a delay of hiring an engineer on his team, that knowledge does not reasonably provide an inference that the revenue for the quarter would be materially below expectations.

At oral argument, the SEC resorted to the argument that the implementation of MDI's expense control program could be considered material by a jury. Argued counsel for the SEC:

> It's whether or not they perceive revenues to be down such that they had to change their business, and that's the message that we think comes across here.

11. Reporter's Transcript of January 19, 2000 hearing ("RT") at 13:11–15.

And in terms of a circumstantial case, could he have found this out. Imagine Congress forgot to appropriate any money for the lights in this building and one day the General Services Administration gets an email saying, "Turn off the lights." You may never see that email, but the lights go off. Chances are you're going to ask why.

In this case we believe that it is fair to read from the documents in front of you that Mr. Hahn Truong is an intelligent, accomplished individual. He became the head of the software engineering group at Molecular. He was at the company for years. He formed his own company after leaving. Intelligent people perceive what's going on around them. And when something changes they can ask questions why. We believe that is the type of circumstantial argument we are entitled to make in front of the jury on these facts.

Management saw revenues were down. They had to change things at the company. Those are the types of things that can be changed, and somebody can come along and ask questions.[12]

While the Court does not dispute the SEC's general argument that expense controls could in theory raise alarm bells in employees' minds, the SEC has failed to produce any probative evidence that working conditions at MDI changed in any appreciable way prior to March 22, 1994, when Singleton held his engineering meeting and informed his team about the expense control program and the hiring freeze. Accordingly, the SEC cannot base its case on the existence of an expense control program in effort prior to March 22, 1994

Finally, the SEC points to testimony by Singleton that there was "general discomfort" about the quarter among employees. Again, this "fact" is too vague to be considered material by a reasonable jury, particularly in light of publicly expressed worries about the company's revenue potential.

### 2. Possession of Material Non-public Information on March 22, 1994

The SEC has presented evidence showing that Hahn learned on March 22, 1994 that senior staff had frozen headcount and had ordered an expense control program because the outlook for the quarter was behind plan. A reasonable jury could deem this information material because a reasonable investor could consider it significant that MDI was behind plan so late in the quarter.

### 3. Evidence of Use of Material Non-public Information Possessed by Hahn after March 22, 1994

■ Under the 11th Circuit's rule in *Adler*, possession of material nonpublic information at the time of a trade gives rise to a "strong inference" of use. *See* 137 F.3d at 1337. However, under the Ninth Circuit's rule in *Smith*, the government in a criminal prosecution has the burden to prove that the defendant actually used the material non-public information in formulating and executing a trade. *See* 155 F.3d at 1067–69. Assuming, without deciding, that the higher evidentiary burden in *Smith* applies to this civil enforcement proceeding, the SEC has offered sufficient evidence on which a reasonable jury could conclude that Hahn and Hen used material non-public information in executing the March 23 and 24, 1994 trades.

While Hahn himself did not trade in MDI after March 22, 1994, the SEC has presented some evidence that could give rise to a reasonable inference that Hahn coordinated with Hen to use Hahn's money to short sell 15,000 shares of MDI on March 23 and 24, 1994. Following the March 22 meeting, Hahn transferred $120,000 from his sale of MDI stock the previous week and transferred it to a Wells Fargo Bank account. The next

---

**12.** RT at 58:22–59:17.

morning Hen opened a new account in his own name and short sold 10,000 MDI shares, a transaction approaching his annual income. Hen short sold an additional 5,000 shares the next day. The value of Hen's short sale on March 23, 1994 approximates Hen's annual income and represents nearly half of his net worth. That short sale was also Hen's largest transaction by value in MDI stock. The March 24 short sale was his third largest.[13]

In light of evidence of a coordinated effort between Hahn and Hen to transfer money on March 22 and March 23, 1994, a reasonable jury could infer that Hahn communicated with Hen on March 22 or March 23, 1994. A jury could also conclude that Hen's disproportionately heavy short selling on March 23 and March 24, 1994 indicated that Hen used negative information about the shortfall expected for Q1 in deciding to short sell the stock. Furthermore, the SEC also has provided evidence that Hen and Hahn provided somewhat differing explanations for the transaction, and that Hahn and Hen took notable pains to keep the transaction hidden. Instead of journalling funds from Hen's to Hahn's McLaughlin account, Hen used two wire transfers from McLaughlin to his wife's Home Savings bank account. Hen's wife then wrote four separate checks to Hahn.

The Court does not dispute that Hen has provided a credible explanation for the loan from Hahn and the subsequent short sales,[14] but it is for a jury, not the Court, to determine credibility. The evidence concerning the March 23 and 24, 1994 trades supports a variety of reasonable inferences, and this Court must draw all reasonable inferences in favor of the SEC. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Therefore it would be improper to grant Hahn's motion for summary judgment concerning the post-March 22 trading.

### 4. Conclusion

Because the SEC has submitted no specific, probative evidence, direct or circumstantial, that Hahn saw, heard about, or possessed any material, non-public information about MDI's financial condition prior to March 22, 1994, summary judgment must be GRANTED in favor of Hahn as to all pre-March 22, 1994 trades. However, the Court DENIES Hahn's motion with regard to his alleged involvement in Hen's trading occuring on March 23, 1994 and thereafter.

### B. Hieu Truong

■ Hieu states he decided to sell his MDI stock after he perceived the stock price to be weakening, and further contends that he was a short-term trader who never intended to hold his stock for very long. Hieu also contends that the bulk of his sales were prompted by concerns about MDI's nonappearance at the Cowen conference.

The SEC contends it has provided sufficient evidence on which a reasonable jury could conclude that Hieu traded on the basis of material non-public information. It argues that Hahn provided inside information to Hieu on the evening of March 16, 1994, when there were three phone calls between Hahn's office and Hieu's res-

---

**13.** Hahn could not have engaged in this transaction directly because his trading window had closed, and MDI rules prohibited Hahn from short selling MDI stock at any time.

**14.** Hen explains that Hahn had been safekeeping $40,000 of Hen's money from a time period before Hen had to move out of the San Jose area in 1989. Hen has provided credible evidence that his life is constantly under threat from organized crime groups. Hen and his family were taken into federal protec-

tive custody in October 1989. For three years, the family lived under an assumed name in Southern California. He has taken substantial steps to keep his whereabouts secret. This has included not opening or using bank accounts. The other portion of the money paid to Hahn, says Hen, derives from profits earned when Hen traded Caere Corporation stocks in 1993, with the assistance of Hahn.

idence. Hieu placed a significant sell order on March 17. Hieu argues that if he had received inside information on March 16, as the SEC argues, he would have sold all of his stock immediately and sold short as well. The following day, March 17, he did not sell any other shares or sell any shares short. That day he also learned that MDI cancelled an appearance at the Cowen conference.

It is not necessary to address Hieu's various explanations for his trading because the SEC cannot prove that Hieu received material non-public information from Hahn prior to March 22, 1994. A tippee cannot be liable, of course, where the SEC fails to show that the alleged tipper possessed inside information. Accordingly, summary judgment must be granted in favor of Hieu as to all pre-March 22, 1994 trades.

Summary judgment should also be granted as to the post-March 22 trades. First, Hieu's trading pattern on March 22 and March 23 was entirely unremarkable in light of Hieu's much heavier trading the preceding week, selling just 800 shares on March 22 and 1,500 shares on March 23. Second, the SEC has presented no evidence that Hahn and Hieu communicated on March 22 or March 23, 1994. Hieu's motion for summary judgment must be GRANTED in its entirety.[15]

### C. Hen Truong

For the reasons set forth in Part IV(A)(1), above, Hen's motion for summary judgment is GRANTED as to all pre-March 22, 1994 transactions. The SEC failed to provide substantial evidence that Hahn, the alleged tipper, possessed material non-public information prior to March 22, 1994. The motion is DENIED as to the March 22 and March 23, 1994 short sales, for the reasons set forth in Part IV(A)(2) and (3).

### E. Christopher Nguyen

 Nguyen argues that the SEC has failed to demonstrate contact between Nguyen and Hahn, the alleged tipper. The SEC points only to a single telephone call lasting between one and 60 seconds placed to Hahn's office the day after Nguyen sold his position in MDI and after Nguyen placed his first order to short sell the stock. Furthermore, as Nguyen pointed out in his Reply brief, the SEC scarcely refers to Nguyen in the 40 pages it filed in opposition to Defendants' motions for summary judgment, except to recite the fact of his trades in MDI stock.

Nguyen argues that that he sold his shares because the stock price was declining. The SEC has failed to provide an explanation as to how Hahn tipped Nguyen prior to Nguyen's placement of the sell order. It does not suffice for the SEC to state that Nguyen "lacked an innocent explanation," where the burden is on the SEC to provide evidence that Nguyen used material non-public information in executing his trades.

Nguyen's motion for summary judgment is GRANTED.

### V. CONCLUSION

Because there is a genuine issue of fact as to whether Hahn Truong possessed material non-public information on March 22, 1994, and whether he tipped Hen Truong, and whether Hen thereupon traded on material non-public information with Hahn's financial assistance, the summary judgment motions brought by Hahn Truong and Hen Troung must be DENIED in part. The Court's Order is summarized as follows:

(1) Hahn Truong—Motion for summary judgment is DENIED as to trading by

---

**15.** In March of 2000 the Court communicated to the parties that it intended to deny Hieu's motion for summary judgment. The Court

apologizes to the parties for any inconvenience created by this change in position.

Hen on March 23, 1994 and thereafter. The motion is GRANTED in all other respects.

(2) Hieu Truong—Motion for summary judgment is GRANTED in its entirety.

(3) Hen Truong—Motion for summary judgment is DENIED as to trading by Hen on March 23, 1994 and thereafter. Motion for summary judgment is GRANTED in all other respects.

(4) Christopher Nguyen—Motion for summary judgment is GRANTED in its entirety.

IT IS SO ORDERED.