SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Alejandro Duclaud GONZALEZ DE CASTILLA, Jose Antonio Duclaud Gonzalez de Castilla, Pablo Velazquez Baranda, Maricruz Lozano Ledzma, Rodrigo Igartua Baranda, Elvira Baranda Garcia, Ana Igartua Baranda de Duclaud, Martha Baranda de Igartua, Anushka Trust, Caribbean Legal Trust, Antares Holdings Investment Ltd., and Banrise Ltd., BVI., Defendants.

No. 01 CIV 3999(RWS).

United States District Court, S.D. New York.

Feb. 8, 2002.

Securities and Exchange Commission, Washington, DC (John D. Worland, Jr., Mark Kreitman, Lawrence A. West, Neil J. Welch, Jr., Jose M. Rodriguez, Nancy McGinley, of Counsel), for Plaintiff.

Cravath, Swaine & Moore, New York City (John E. Beerbower, of Counsel), for Defendant Alejandro Duclaud Gonzalez de Castilla Martha Baranda de Igartua, Ana Igartua Baranda de Duclaud and Anushka Trust.

Gleason Koatz & Dyer, New York City (John P. Gleason, of Counsel), for Defendant Jose Antonio Duclaud.

Hogan & Hartson, New York City (Ira M. Feinberg, Lyndon M. Tretter, of Counsel), for Defendants Pablo Velazquez Baranda, Elvira Baranda Garcia, and Maricruz Lozano Ledezma.

Squadron Ellenoff Plesent & Sheinfeld, New York City (Ira Lee Sorkin, of Counsel), for Defendant Rodrigo Igartua Baranda.

Milbank, Tweed, Hadley & McCloy, New York City (Andrew E. Tomback, Matthew M. Oliver, Jennifer M. Anglim, of Counsel), for Non–Party Ignacio Guerrero (Beneficiary of Banrise Ltd. BVI).

### OPINION

SWEET, District Judge.

Defendant Alejandro Duclaud Gonzalez de Castilla ("A.Duclaud"), Anteres Holdings Investment, Ltd. ("Antares"), Jose Antonio Duclaud Gonzalez de Castilla ("J.Duclaud"), Caribbean Legal Trust, Rodrigo Igartua Baranda ("Igartua"), and Banrise Limited B.V.I. ("Banrise"), have moved pursuant to Rule 56, Fed.R.Civ.P.,

for summary judgment dismissing the complaint of the plaintiff Securities and Exchange Commission ("SEC") which has alleged insider trading violations of the securities laws in connection with a January 2000 tender offer for CompUSA, Inc. ("CompUSA"). The SEC has moved pursuant to Rule 15, Fed.R.Civ.P. to amend its complaint to add allegations of insider trading violations in connection with the acquisition of Pasteleria Francesa ("El Globo") in May 1999, and to add claims relating to a transaction involving Prodigy Communications Corporation ("Prodigy") in November 1999. For the reasons and upon the findings and conclusions set forth below, both motions are granted.

### Parties

The parties at the outset of the action were described in the June 27, 2001 opinion of this Court in SEC v. Duclaud Gonzalez de Castilla, 145 F.Supp.2d 402 (S.D.N.Y.2001) ("Duclaud I ") and those descriptions are repeated in substance here.

SEC is a governmental agency charged with the task of ensuring compliance with federal securities laws.

A.Duclaud is a Mexican citizen and resident married to defendant Ana Igartua Baranda de Duclaud ("A.Igartua"), who is also the sister of Igartua. At all times relevant to this action, A.Duclaud was a partner in the Mexico City law firm of Franck Galicia, Duclaud and Robles, S.C. ("Franck Galicia"). At the relevant times, Franck Galicia represented prominent Latin American investor Carlos Slim Helu ("Slim") and his companies, including Grupo Sanborns, S.A. de S.V. ("Sanborns") which acquired CompUSA in a tender offer publicly announced on January 24, 2000.

A.Duclaud is the settlor, or creditor, of nominal defendant Anushka Trust. The Anushka Trust is governed by English law and beneficially owns all the stock of An-ushka Holdings, Ltd. The Anushka Trust makes equity investments through an account at Paine Webber, Inc. ("Paine Webber"), including the CompUSA trades at issue in this action. A.Duclaud first created his offshore trust and corporation in 1998 and, in establishing the trust and corporation, his name and address, a copy of his passport and a copy of the masthead for his law firm all were provided to Paine Webber. A "Form W–8BEN: Certificate of Foreign Status of Beneficial Owner for the United States Tax Withholding" was filed with the Internal Revenue Service on the day that Anushka Holdings, Ltd. was established. The offshore account was created for reasons of security and to obtain favorable tax treatments with respect to capital gains.

Defendant J.Duclaud, the brother of A.Duclaud, is a Mexican citizen and resident who practices law in Cancun. J.Duclaud is the settlor, or creator, of nominal defendant Caribbean Legal Trust, which beneficially owns all the stock in Caribbean Legal Holdings, Ltd. ("Caribbean Legal Holdings"). The Caribbean Legal Trust makes equity investments through an account at Paine Webber, including the CompUSA trades at issue in this case.

Defendant Pablo Velazquez Baranda ("Velazquez") is a Mexican citizen and resident. His cousin is married to A.Duclaud. Velazquez traded CompUSA stock through an account at Lehman Brothers, which he held in his own name jointly with his wife, defendant Maricruz Lozano Ledzma ("Lozano") and his mother, defendant Elvira Baranda Garcia ("Baranda").

Defendant Igartua, a Mexican citizen and resident, is a professional financial advisor who acts as the Chairman and Chief Executive Officer of SB Asesores S.A. de C.V. ("S.B.Asesores"), and is the president of defendant Antares, an offshore company established in order to fa-

cilitate his investment. He is Velazquez's cousin and A.Igartua's brother, and is thereby A.Duclaud's brother-in-law. Martha Baranda de Igartua is his mother. Both A.Duclaud and J.Duclaud are Igartua's clients.

Non-party witness Ignacio Guerrero ("Guerrero") was an executive director of Banco Internacionale ("Bital"), one of the largest banks in Mexico. He is also the beneficial owner of defendant Banrise Ltd. BVI ("Banrise"), an entity formed under the laws of Ireland in the mid–1990's, and reorganized under the law of the British Virgin Islands in the summer of 1999, which trades through Beta Capital Management, L.P. ("Beta Capital"), in Miami, Florida. Guerrero is a long-time friend of A.Duclaud and Igartua.

### Prior Proceedings

This action was commenced by the filing of the complaint and an application for a temporary restraining order on May 10, 2001, which was entered that date and modified on May 17, freezing assets in brokerage accounts held by the defendants. Expedited discovery was granted, and a motion for preliminary injunction and a continuation of the freeze was made.

On June 27, 2001, in *Duclaud I,* the motion for an injunction was denied, and the freeze was continued, except as to defendants Velazquez, Lozano, and Baranda. Discovery continued and on August 20, 2001, Rule 12(b)6 motions by the defendants Lozano, Baranda, and A.Igartua were denied in an opinion filed that date. *S.E.C. v. Duclaud Gonzalez de Castilla,* No. 99 Civ. 3999(RWS), 2001 WL 940560 (S.D.N.Y. Aug.20, 2001) (*"Duclaud II "*) (denying motion to dismiss for lack of personal jurisdiction, with leave to refile after close of discovery). On October 2, Velazquez, Lozano, and Baranda were dismissed from the action by stipulation. On November 2, 2001, a motion by J.Duclaud, Banrise, and Guerrero to modify the asset freeze on their accounts was granted in part to allow the payment of legal expenses. *S.E.C. v. Duclaud Gonzalez de Castilla,* 170 F.Supp.2d. 427 (S.D.N.Y. 2001).

On August 10, 2001, J.Duclaud and Caribbean Legal Trust filed the instant motion for summary judgment, joined subsequently by A.Duclaud, Igartua, Antares, and Banrise. The SEC filed a motion to amend the complaint on September 5.

The instant motions were heard and marked submitted on October 31, 2001.

### The Issue

The SEC has posited that the defendants constituted "an insider trading ring operating out of Mexico City" (Pls.' Opp'n to Mot. for Summ. J., at 1) which made millions from purchases and sales of CompUSA stock, consistent with two prior investments based on inside information. A.Duclaud is charged as a "tipper" who provided the inside information to the various other individual defendants. According to the SEC, a "signature crime" has been committed, whereby payoffs were made on each investment for the information provided.

A.Duclaud, a member of a prominent Mexico City law firm, has maintained his innocence and undertaken to prove the negative. That is, he claims that he had no inside information because it did not exist at the time of the purchases of CompUSA stock. The resolution of the motions turn largely on the factual record.

### The Facts with Respect to the CompUSA Tender

A.Duclaud and J.Duclaud have submitted Statements of Facts pursuant to Local Rule 56.1, and the SEC has submitted a Revised Rule 56.1 Statement from which the following facts relating to the transactions and activities surrounding the Com-

pUSA tender offer are drawn. These facts are not in dispute except as noted.

Slim is a billionaire Mexican businessman whose companies account for almost half of Mexico's stock index. He has received international attention as a shrewd bargain hunter with a reputation for "snapping up distressed companies at discount prices" and earning astronomical profits. (Beerbower Aff. Ex. G.). The phenomenon of investors following Slim was well established in Mexico by 1999.

On September 10, 1999, Slim filed a Schedule 13G indicating that he, his family, and their affiliated entities had acquired 14.1% of the outstanding shares of CompUSA which were listed on the New York Stock Exchange. In September 1999, national news outlets were reporting widespread speculation about a possible takeover of CompUSA. (Alan Goldstein and Dianne Solis, "Mexican Tycoon Buys Stake in Dallas–Based Retailer CompUSA," The Dallas Morning News, 1999 WL 22014607 (Sept. 13, 1999)).

Knight–Ridder reported on September 13, 1999 that CompUSA had been the subject of persistent takeover rumors and noted that "[s]hares in CompUSA rose 6 percent Friday as word spread on Internet chat boards about Mr. Slim's involvement." (*Id.*) Stock analysts were quoted as stating that "it is too early to speculate what the Slim family investment could mean for CompUSA," but nonetheless opined that "[i]f I were CompUSA, I'd take this as a vote of confidence that someone believes in the future potential of the company." (Lila LaHood, "Mexican Group Buys Stake in CompUSA," Fort Worth Star–Telegram, 1999 WL 22015247 (Sept. 14, 1999)).

Guerrero and his business partner, Gustavo Ortega, were prompted by Slim's 13G filing to begin reviewing analyst reports, news reports, and other financial information concerning the desirability of selecting CompUSA as an investment vehicle for themselves and for their clients.

On November 5, 1999, James F. Halpin ("Halpin"), the Chief Executive Officer of CompUSA, had a meeting in Mexico City with Slim, Chairman Emeritus of Grupo Carso, S.A. de C.V. ("Carso"), a Mexican holding company that controls Sanborns; Arturo Elias Ayub ("Elias"), Director of Strategic Alliances, Communication, and Institutional Relations of Telefonos de Mexico, S.A. de C.V. ("Telmex"); and Eduardo Valdes Acra, the Chief Executive Officer of Inversora Bursatil, S.A. de C.V. During this meeting the parties discussed the possibility of establishing various commercial arrangements between CompUSA and Sanborns and its affiliates, and Elias and Slim indicated in general terms that Sanborns continued to be interested in exploring the possibility of increasing its investment in CompUSA.

On November 22, 1999, a Schedule 13D was filed on behalf of Carso, Sanborns, Slim, and members of Slim's immediate family, indicating they owned 14.8% of CompUSA shares and reserved the right to formulate plans that might affect control of CompUSA. Rafael Robles Miaja ("Robles"), a partner of A.Duclaud and a member of the Franck Galicia firm was consulted with respect to the form of the 13D and listed as counsel, but took no further action with respect to the filing.

The media speculation increased following Slim's 13D filing in late November of 1999: a Dow Jones News Service headline of December 9, 1999 read, "Potential Influence of Mexican Mogul Moves CompUSA." (DJNS 12/9/99 17:05:00).

Nicholas Grabar ("Grabar"), a partner in the New York office of Cleary, Gottlieb, Steen & Hamilton ("Cleary"), which represented the Slim interests, knew in late November of 1999 that people who worked for Slim and his companies were thinking

about the possibility of acquiring CompU-SA. Grabar talked to Robles during the period of December 1999 to January 2000 about setting up U.S. limited liability corporations or "LLCs" for Robles' Mexican clients, and it is possible CompUSA came into the conversation. Jorge Juantorena ("Juantorena"), also a partner at Cleary who knew of the CompUSA matter, had similar discussions, and may have discussed the Slim group's rejection of a standstill agreement for its CompUSA shares during the first week of January 2000.

In telephone calls early in December and in meetings in Mexico City and in Dallas on December 16, 1999, the principals discussed the valuation of CompUSA shares. At the Dallas meeting, the parties concluded that they had differing views with respect to the valuation of CompUSA and agreed to defer further discussion. During the week of January 10, 2000, acquisition proposals at a valuation of up to $9 per share were discussed, and Halpin stated that he would discuss the matter with CompUSA's Board of Directors. There were also discussions with Credit Suisse First Boston as representative of CompUSA.

Guerrero met with Igartua on January 5, 2000 to discuss the possibility of Guerrero becoming involved in a real estate venture in Acapulco that Igartua had been pursuing with A.Duclaud, and the subject of CompUSA arose in connection with Slim's 13D filing. Guerrero agreed with Igartua's assessment that CompUSA looked like a good investment, particularly given Slim's involvement. On January 6, 2000, Igartua's Antares bought shares of CompUSA stock. The same day, Banrise bought CompUSA shares. On January 7, 2000, Antares bought additional shares of CompUSA stock.

In the first week of January 2000, Cleary was working on a "standstill agreement" with Slim for the CompUSA investment. According to Juantorena, there was discussion of a standstill agreement because Slim wanted to increase his holdings to just under 20% without triggering provisions of Delaware corporate law that would prevent a stockholder acquiring more than 15% of a company's stock without board approval from pursuing certain further opportunities with that company for three years. Slim was prepared to agree not to increase his holdings beyond 20%, but CompUSA insisted on a variety of additional restrictions that were not acceptable to him. In the midst of those discussions, the Slim group refused to go forward with the proposed agreement. According to Juantorena, Slim's rejection of the standstill agreement led Juantorena to believe that Slim would not go forward with an offer for CompUSA. Although not set forth in the parties' Local Rule 56.1 Statements, the facts concerning the standstill agreement are not disputed.

On January 12, 2000, A.Duclaud issued a request to the Anushka trustees to transfer approximately $104,000 from Anushka to Antares. The funds were withdrawn from Anushka on January 14, but were not received by Antares until January 21.

On January 18, 2000, Halpin testified in a preliminary injunction hearing in the case captioned *COC Services Ltd. v. CompUSA, Inc.,* No. 00–00023–b (County Court, Dallas County, TX), indicating in connection with a question concerning Slim's intent to acquire CompUSA that there were matters which were confidential and could not be made public. In closing, the COC lawyer stated:

[Halpin] never told you [the Court] when he started caring. We know when he started caring, and I won't go into specifics because of the sealed nature, but we know when he started caring. It was when there was some other influ-

ence that affected his ability to realize on three-and-a-half million dollars worth of stock, three-and-a-half million shares of stock. That could have influenced the shares of the price of his stock.

(Beerbower Suppl. Decl. Ex. G, at 234).

The day after these public statements were made and while the Dallas Court was preparing its decision, trading in CompUSA increased. The trading volume of CompUSA on January 19 was 1,102,200 shares, an increase of 110% over the previous day's volume. The trading volume on January 20 was 2,584,200 shares and on January 21, the trading volume was 5,778,-000. By January 21, 2001, the share price of CompUSA stock was up approximately 23% from the opening price that week.

On January 19, 2000, Igartua bought 20,000 CompUSA shares through Antares at $5.375 for $108,504 and 10,000 CompUSA shares in a Lehman account at $5.50 for $55,164. He then owned a total of 105,000 shares for a total investment of $446,545. On January 19, Guerrero bought another 193,200 CompUSA shares through Banrise at $5.5625 for $1,053,214. J.Duclaud spoke with A.Duclaud on January 19 and reported that Igartua had recommended a purchase of CompUSA shares, although J.Duclaud had not previously owned common stock and had recently suffered losses in investments in U.S. companies. A.Duclaud advised that in his view it would be a good bet. J.Duclaud's Caribbean Trust bought 50,000 CompUSA shares on January 19, at $5.4375 per share for $271,875.

On January 19, 2000, after a conversation with Igartua, A.Duclaud authorized Igartua to purchase for him 180,000 shares in CompUSA stock and, during the morning of January 20, 2000, Igartua telephoned his broker at Paine Webber and authorized the purchase of 150,000 shares of CompUSA in an account for which A.Duclaud is a named beneficiary.

On January 20, A.Duclaud's Anushka Trust bought 50,000 CompUSA shares at $5.50 for $275,000, 26,100 shares at $5.875 for $153,337, 35,800 shares at $6.125 for $219,279, and 38,100 shares at $5.5625 for $211,931—a total of 150,000 shares for $859,548. Defendants Martha Baranda de Igartua, A.Igartua, and Igartua also bought 20,000 CompUSA shares in their joint account at $5.5625 for $112,154. CompUSA's stock closed that day at $6.125 on volume of 2,584,200 shares.

During the day on January 20, 2000, A.Duclaud and his wife traveled with friends to New York City for a vacation.

On the afternoon of January 20, 2000, Javier Cervantes Sanchez Navarro, Director of Special Projects for Inversora Bursatil, S.A. de C.V., a company affiliated with Sanborns and Slim, telephoned Robles informing him that Sanborns was planning to acquire CompUSA and asked that Robles be available in New York to consult on issues of Mexican law. Robles testified he did not discuss this information with anyone at Franck Galicia.

On January 21, the Slim group presented a proposed merger agreement to CompUSA. The parties and counsel met in New York to continue to negotiate terms of the proposed acquisition. CompUSA's stock closed that day at $6.75 per share.

On January 24, prior to the opening of trading on the New York Stock Exchange, Sanborns and CompUSA issued a joint press release announcing a merger agreement. On that day, the stock closed at $9.50 on volume of 24,615,200 shares.

On January 26, A.Duclaud sold his 150,-000 CompUSA shares at $9.625, for proceeds of $1,443,750 and profits of $584,202. Guerrero sold Banrise's 493,200 CompUSA shares for proceeds of $4,727,160 and profits of $2,088,675. Igartua's Antares account sold its 75,000 shares at $9.625, for

proceeds of $719,595 and profits of $328,215. Igartua also sold the 10,000 shares in his Lehman account for $9.625 per share, proceeds of $95,948, and profits of $40,748. Defendants Martha Baranda de Igartua, A.Igartua, and Igartua sold the 20,000 CompUSA shares in their joint account at $9.625 for proceeds of $191,889, and profits of $79,735. Finally, J.Duclaud sold his 50,000 shares at $9.625, for proceeds of $481,250 and profits of $209,375.

On February 9, 2000, Igartua transferred $104,567 from his Antares account to A.Duclaud's Anushka account, which according to A.Duclaud and Igartua was the repayment of prior transfer to Antares on January 12. On March 31, Igartua transferred $130,915 from his Antares account to A.Duclaud's Anushka account. According to A.Duclaud and Igartua, this payment represented the profits on 30,000 shares of CompUSA purchased by Igartua for A.Duclaud's benefit because of A.Duclaud's concern about margin requirements.

In May 2001, Igartua learned that the Anushka account had been frozen and requested funds from an account of his with Lehman Brothers, a request which was not honored. On May 8, he sought unsuccessfully to transfer funds from the accounts of Martha Baranda de Igartua, his mother, and A.Igartua, his sister.

No reports were made by A.Duclaud to the Mexican tax authorities arising out of the CompUSA trading, according to A.Duclaud, because of his reliance upon an opinion from a Mexican tax firm. The trades were also not revealed by A.Duclaud to the partners of Franck Galicia because of his belief that he was under no obligation to do so.

### The Facts with Respect to the El Globo Tender Offer and the Prodigy Transaction

The facts relating to the El Globo and Prodigy transaction were not part of the parties' Local Rule 56.1 Statements but were set forth by affidavit and in the proposed amended complaint. They are undisputed except as noted.

In May of 1999, the stock of El Globo, a well-known Mexican bakery chain, was trading on the Mexican Bolsa for about 2.75 pesos, or roughly 30 cents U.S. per share. On May 3 and 4, total trading volume was 54,000 shares.

On May 5, 1999, the Franck Galicia law firm received a telephone call from representatives of Slim to put the law firm on notice that the Slim group might need rapid legal assistance in connection with a proposed transaction involving El Globo. A.Duclaud was present at the firm that day, and phone records indicate that at 11:20 a.m. he made a telephone call to Igartua.

On the morning of the next day, May 6, 1999, before the Mexican market opened, Guerrero placed a limit order to buy 5 million shares of El Globo for exactly 2.75 pesos per share through his Banrise account with Beta Capital. Beta Capital forwarded the order to the Mexican brokerage firm of Operadora de Bolsa Serfin ("OBSA") at 8:11 a.m.

Pursuant to instructions from Beta, OBSA did not immediately place the order into the Mexican Bolsa's electronic market where it would have been visible to any market participant in the pre-opening order, but held the order in response to an instruction to look as soon as the session opened for a sale position for that volume of shares, and to "take it." (Quevedo Decl. ¶ 21).

On May 6, Guerrero had his then employer Bital place a limit order with its brokerage subsidiary to sell 5 million shares of El Globo from Bital's proprietary account, also for 2.75 pesos per share. Then, at exactly 8:31:31:76 a.m., the Bital

brokerage unit entered the sell order into the electronic order "book" of the Mexican Bolsa. Two seconds later, OBSA entered the buy order. At 8:31:34:05 a.m., the two orders crossed inside the Mexican Bolsa's computer system. The submission of the orders prevented the public display of either order.

Over the course of May 6 and May 7, Sanborns bought 153,109,550 El Globo shares, roughly 60% of the total then outstanding, at an average price of 3.4022 pesos. After the close of trading on May 7, Sanborns announced publicly that it had acquired a 60% position in El Globo. Subsequently, Sanborns made a public tender offer for the rest of the El Globo shares, using its average purchase price on May 6 and 7 (3.4 pesos per share) as the tender offer price.

During the trading day on May 7, 1999, shortly after the Franck Galicia firm made a competition filing with the Mexican Government on behalf of Sanborns, Guerrero sold all of his recently acquired 5 million shares of El Globo at 3.45 pesos per share, for a net profit of 3,329,500 pesos (in excess of $350,000 U.S.).

An account in the name of Martha Baranda de Igartua placed orders and successfully acquired 41,000 shares of El Globo in two separate trades on May 6, 1999, just as Sanborns began its acquisitions. The account of Martha Baranda de Igartua paid 3.14 pesos on May 6, and resold the same shares for 3.45 pesos the next day on May 7.

A.Duclaud sold 45,000 shares of El Globo on May 7, 1999, at a price of 3.50 pesos.

On May 13, 1999, Guerrero wired $115,400 from his Banrise account to A.Duclaud's Anushka Trust account. According to Guerrero and A.Duclaud, this was payment for legal services related to Guerrero's divorce, his interest in acquiring a private Mexican company, and services related to setting up Banrise.

According to A.Duclaud, the documents relating to these services have been withheld on the grounds of privilege. Mexican taxes have not been paid based on an opinion of counsel relating to payment for services to an offshore Irish corporation.

In 1999, Prodigy was an internet service provider headquartered in White Plains, New York with stock traded on the Nasdaq stock market, of which about 60% was owned by Telmex and Carso Global Telecom, two Mexican companies controlled by Slim and his family. Franck Galicia represented Telmex and Carso Global Telecom.

During April of 1999, the Slim group had begun to consider a transaction involving Prodigy and SBC Communications, Inc. ("SBC"). Franck Galicia had confidential information about this possibility by at least May of 1999. By September 27, 1999, voluminous documents were being sent to the Franck Galicia firm concerning the transaction and by October 14, lawyers at the firm began to bill for legal services directly related to the Prodigy–SBC deal. On October 15, 1999, Prodigy's general counsel sent a term sheet for the deal to Franck Galicia. The cover page indicated that the term sheet would "be circulating to [the Prodigy] Board next week." (Worland Decl. Ex. 6). On October 20, Prodigy e-mailed a revised term sheet to the Franck Galicia firm. On that same day, a special meeting of the Prodigy Board convened at 1:00 p.m. Eastern time to review the proposed Prodigy–SBC deal. A.Duclaud and Guerrero spoke on the telephone on October 20, 1999.

On October 21, 1999, Guerrero began buying Prodigy stock. In ten purchases between October 21 and November 18, 1999, he accumulated 56,100 Prodigy shares through his Banrise account at prices ranging between $21.50 and $24.75 a share, for a total costs of $1,263,868.

Guerrero sold Prodigy stock on October 29.

On October 25, 1999, Igartua opened his first offshore securities trading account in the name of defendant Antares. He transferred into the account corporate bonds and money-market securities valued at $759,093. On Thursday, November 18, Igartua bought his first equity securities in the Antares account, 3,000 shares of Prodigy at $26.18 per share, for a total cost of $79,017. Between November 15 and November 19, A.Duclaud spoke to Guerrero and Igartua every day.

On Monday, November 22, 1999, just before the market opened, SBC announced that it would take a 43 percent stake in Prodigy. During the four weeks preceding this announcement, the price of Prodigy common stock had fluctuated between a high of $25.75 and a low of $20.625 at the close. On Monday, November 22, 1999, the date of the announcement, Prodigy reached a high of $35.4375 and closed at $31. On that same day, Monday, November 22, 1999, Guerrero sold all 56,100 of his shares at $33.36 per share, for proceeds of $1,871,284 and a profit of $607,416. Igartua also sold all of his 3,000 Prodigy shares that day at $33.50 per share for proceeds of $99,592 and a profit of $20,575.

On November 24, 1999, two days after selling his Prodigy stock, Guerrero wired $148,300 from his Banrise account to A.Duclaud's Anushka Trust. According to both A.Duclaud and Guerrero, the payment was for Guerrero's purchase of A.Duclaud's Mexico City apartment. No documents relating to the sale have been produced. A year and a half later, the apartment was listed for sale in A.Duclaud's name. The only persons who have lived in the apartment are members of A.Duclaud's family.

## CONCLUSIONS OF LAW

### I. Applicable Legal Standards

#### A. Section 10(b) of the Exchange Act and Rule 10b–5 (Count One)

■ The SEC relies on the "misappropriation theory" to support its claim under § 10(b) of the Exchange act and Rule 10b–5. The misappropriation theory applies to "outsiders to a corporation who have access to confidential information that will affect the corporation's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders." *Dirks v. SEC,* 463 U.S. 646, 653, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). The misappropriation theory only bars trading on such information where the defendant violates a direct fiduciary or contractual duty to the holder of such "inside" information. *See id.* As the Supreme Court has articulated, under the misappropriation theory, "a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." *United States v. O'Hagan,* 521 U.S. 642, 652, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997).

■ To establish A.Duclaud's liability under this theory, the SEC must show that he traded in securities while in knowing possession of material, non-public information, in violation of a fiduciary duty to the source of the information. *Id.* To further establish liability for "tipping," the SEC must show that A.Duclaud passed material, non-public information to the other defendants in violation of his fiduciary duties. *See United States v. McDermott,* 245 F.3d 133, 138 (2d Cir.2001); *United States v. Cusimano,* 123 F.3d 83, 87 (2d Cir.1997), *cert. denied,* 522 U.S. 1133, 118 S.Ct. 1090, 140 L.Ed.2d 146 (1998); *SEC v. Falbo,* 14 F.Supp.2d 508, 521–24 (S.D.N.Y.

1998). To establish liability on the part of any of the other individual defendants as "tippees," the SEC must show that A.Duclaud breached his fiduciary duty by disclosing material, non-public information; that the defendants knew or should have known that there was such a breach of fiduciary duty; and that they traded in reliance upon the material, nonpublic information received from A.Duclaud. *See Dirks*, 463 U.S. at 660, 103 S.Ct. 3255. Additionally, the SEC mush establish that A.Duclaud received a direct or indirect personal benefit from the disclosure. *Id.* at 663–64, 103 S.Ct. 3255.

### B. *Section 14(e) of the Exchange Act and Rule 14e–3 (Count Two)*

■ To establish a claim under Rule 14e–3, the SEC must show that A.Duclaud traded on the basis of material non-public information concerning a pending tender offer that he knew or had reason to know had been acquired directly or indirectly from an insider of the offeror or issuer or someone working on their behalf. Rule 14e–3, 17 C.F.R. § 240.14e–3(a); *see also O'Hagan*, 521 U.S. at 669, 117 S.Ct. 2199. In contrast to the Rule 10b–5 standard articulated above, the SEC need not show that information was disclosed in breach of a fiduciary duty to establish a violation of Rule 14e–3. *O'Hagan*, 521 U.S. at 670–72, 117 S.Ct. 2199. However, similar to the Rule 10b–5 standard the SEC must demonstrate that A.Duclaud had access to material nonpublic information pertaining to the tender offer and that he traded on the basis of that information.

### C. *The Standard for Summary Judgment*

Summary judgment is appropriate:

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). In assessing a summary judgment motion, the court should credit the evidence of the nonmoving party, and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As the Court in *Anderson* explained, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505. Credibility determinations, the weighing of the evidence, and the drawing of inferences from facts are jury functions, not those of a court ruling on summary judgment. *Id.* at 255, 106 S.Ct. 2505. All ambiguities and reasonable inferences must be drawn against the moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

However, "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (citations omitted), and so summary judgment "will not be defeated merely . . . on the basis of conjecture or surmise." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). Moreover, the moving party does not bear the burden of proving that the nonmovant's case is wholly frivolous. *See Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323–26, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Rather, "in cases where the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim. Thus, the evidentiary burdens that the respective parties will

bear at trial guide district courts in their determination of summary judgment motions." *Brady,* 863 F.2d at 210–11.

The SEC's burden in an insider trading case is no less than any other party in any other case; "summary judgment is appropriate in *any* case where the critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *SEC v. Hoover,* 903 F.Supp. 1135, 1139 (S.D.Tex.1995) (emphasis in original). Thus, regardless of whether the evidence offered is direct or circumstantial, the " 'mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *SEC v. Truong,* 98 F.Supp.2d 1086, 1096–97 (N.D.Ca.2000) (*quoting Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *see also SEC v. Goldinger,* 106 F.3d 409, 1997 WL 21221, at \*3 (9th Cir.1997) ("Although reasonable inferences must be drawn in the SEC's favor, the SEC cannot merely provide circumstantial evidence to show the possibility of illegal trading. The SEC's evidence must be sufficient to allow a reasonable jury could [sic] find it met its burden of persuasion at trial."); *SEC v. Cassano,* 2000 WL 1512617, at \*2 (S.D.N.Y. Oct.11, 2000) ("The case against the moving defendants, as they contend, appears to turn on circumstantial evidence. The Court is mindful also that care must be exercised lest speculation substitute for reason in such a situation.").

## II. *Summary Judgment is Appropriate on Both Count One and Count Two*

While in a motion for summary judgment every inference based upon an established fact must be drawn against A.Duclaud and the other movants, as juries are regularly advised, speculation cannot substitute for proof. *See Bickerstaff v. Vassar College,* 196 F.3d 435, 448 (2d Cir.1999) (explaining that "[a]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist].") (citations omitted); *United States v. An Article of Device,* 731 F.2d 1253, 1263 (7th Cir.1984) (emphasizing "jury's duty not to engage in speculation that is beyond the scope of the evidence"), *cert. denied,* 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 186 (1984); *Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1324 (11th Cir.1982) ("[A] jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such an inference is infirm because it is not based on the evidence."); 4 Leonard B. Sand, et. al., Modern Federal Jury Instructions, Instr. 75–1 (Oct.2001) (charging jurors that "[t]he process of drawing inferences from facts in evidence is not a matter of guesswork or speculation.").

In this case, the SEC concedes that it has not uncovered direct evidence of the existence of "inside information," relying instead on the circumstances, the timing, and the nature of the relationships. Prior to the tender offer announced on January 24, 2000, the market had started to move, with trading increasing 110% on January 19 over the previous day's volume and more than doubling over the next two days. Whether this movement resulted from inside information, market perception, or shrewd judgment was the issue presented to the SEC. Certainly the circumstantial evidence warranted the investigation. Only after full discovery could A.Duclaud's knowledge, or lack of it, be determined. However, here there is direct evidence that the "inside information," the making of the tender offer, could not have been known at the time of the attacked purchases as it did not, as a matter of uncontroverted fact, exist at that time.

Under such circumstances, summary judgment is appropriate.

### A. *Duclaud Possessed No Material Non-public Information*

■ In order to establish liability under either Rule 10b–5 or Rule 14e–3, the SEC must demonstrate that, as a partner at the Franck Galicia firm, A.Duclaud had access to material non-public information pertaining to the CompUSA tender offer. The undisputed evidence, however, makes clear that A.Duclaud did not possess such information.

The Franck Galicia firm was first informed of the CompUSA tender offer by the telephone call to Robles on the afternoon of January 20, 2000. Robles has stated that he did not communicate the information to anyone in the law firm prior to the announcement of the acquisition on January 24. Significantly, however, A.Duclaud authorized the trades at issue on his behalf on January 19, 2000 in a meeting with Igartua, and the trades were called in by Igartua on the *morning* of January 20. A.Duclaud was on his way to New York for vacation when Robles received the call on January 20 and did not return to the office until after the acquisition was announced. As for the alleged tippees, seven out of their nine CompUSA trades occurred between January 6 and January 19. The alleged tippees purchased roughly 93% of their CompUSA stock before January 20. Thus, Franck Galicia had no knowledge of the tender offer until after A.Duclaud's CompUSA trades and almost all of the other trades at issue.

The SEC suggests that Frank Galicia and A.Duclaud may have learned about the tender offer as early as the first week in January by virtue of the Frank Galicia firm's contact with lawyers at Cleary, who had been working on a standstill agreement on behalf of Slim. However, it is speculative to infer from this contact that A.Duclaud acquired inside information. The undisputed facts indicate that CompUSA wanted Slim and his group to execute a standstill agreement, but Slim rejected the agreement. The facts also show that, aside from statements by Juantorena and Grabar that they had no knowledge of the tender offer prior to January 19 and did not discuss CompUSA with Franck Galicia prior to January 20, Juantorena took Slim's rejection of the standstill agreement to mean that there would be no tender offer. Hence, there can be no logical inference that Juantorena, who had a conversation with Frank Galicia on January 6, passed along to Frank Galicia inside information of a tender offer, which then somehow became available to A.Duclaud.

Further, there is no evidence that A.Duclaud gained access to inside information through his own connections. A comparison of A.Duclaud's Rolodex and the submissions to the SEC made on behalf of Sanborns and its affiliates resulted in the identification of a total of eight individuals for whom A.Duclaud had contact information and whom the SEC had identified as knowing of the transaction prior to A.Duclaud's trades. Grabar, the attorney at Cleary, testified that while he cannot recall whether he bumped into A.Duclaud during the three month period (almost two years ago), he was sure that he never spoke to A.Duclaud on the subject of CompUSA. Salameh, the CEO of Prodigy, testified that he had not had any contact with A.Duclaud during the period November 1999 through January 2000.

There is no evidence of a telephone call between A.Duclaud and an insider during the relevant period. This evidence includes the log of telephone calls made and received by A.Duclaud that was kept by his secretary. According to his calendar, A.Duclaud did not attend any meetings with anyone that possessed inside informa-

tion during the relevant period. A.Du-claud's billing records, produced by Franck Galicia to the SEC, show that he did not bill any time to Slim-related entities during the relevant period. In sum, there is simply no evidence of any contact between A.Duclaud and an insider privy to the discussions between Sanborns and CompUSA prior to his trading.

The SEC argues that there is sufficient circumstantial evidence to preclude summary judgment. However, in light of the widespread public speculation surrounding the discussions between Slim and CompUSA and the weakness of the SEC's case, nothing has been adduced to alter the previous conclusion reached on the preliminary injunction motion:

> To show a likelihood that defendants traded on non-public information—a crucial component of a prima facie case for a violation of securities laws—the SEC must establish that Alejandro Duclaud had access to, and passed on, information that was "specific and more private than [these] general rumor[s]."
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Although circumstantial evidence of a defendant outsider's access to non-public information and an opportunity to pass it to tippees might otherwise suffice, more is required where, as here, media speculation of a takeover was widespread, and defendants made more than half of their CompUSA stock purchases on days in which the company's trading volume was rising exponentially.

*Id.* at 36, 38 (*quoting United States v. Mylett,* 97 F.3d 663, 666 (2d Cir.1996)).

Other courts have granted summary judgment in defendants' favor under similar gaps in proof. For example, in *SEC v. Truong,* 98 F.Supp.2d 1086 (N.D.Ca.

2000), defendant Hahn Truong ("Hahn"), an employee and shareholder of a publicly traded company, sold shares of the company in the weeks prior to the company's announcement that it had failed to meet revenue expectations. The SEC offered evidence that, prior to Hahn's trades, (i) several individuals in the company were provided financial documents revealing decreased revenue figures, although there was no evidence that Hahn saw these confidential reports; and (ii) the company's personnel and outside counsel were working on the annual report which discussed the financial condition of the company during an evening that Hahn was working late.[1]

With this evidence, the court faced the same question that is before this Court: "whether the SEC has offered sufficient evidence on which a reasonable jury can infer that [the defendant] was in possession of material non-public information at the time he sold his stock." *Id.* at 1097. It answered by stating:

> Suspicious trading by itself cannot suffice to warrant an inference that an alleged tipper, the first link on the information chain, traded on the basis of non-public information.... Allowing the SEC to tell a jury that "because the tipper's trading was suspicious, the tipper must have possessed some material non-public information," would relieve the SEC of its burden to identify the information, prove its materiality, and prove possession and use by the tipper. Moreover, although the SEC may prove that a defendant possessed material non-public information through the use of circumstantial evidence (beyond alleged "suspicious" trading), the Agency may not rest on evidence that would

---

**1.** The SEC also introduced evidence that Hahn was exposed to more general information about the financial state of the company, which the court found immaterial. *Truong,* 98 F.Supp.2d at 1099–1100.

require a jury *to speculate* that the defendant possessed that information. Courts stress that the SEC may not base insider trading actions on strained inferences and speculation.

*Id.* at 1097–98 (emphasis in original). With respect to the internal memoranda and financial reports disclosing specific financial information, the court found that despite the evidence that Hahn had "access" to the documents, there was no direct or circumstantial evidence that Hahn saw or possessed them. The court further found that with respect to the chance that Hahn discovered inside information while working late, "[a] reasonable jury cannot conclude that the mere open-cubicle environment of a corporation could give rise to an inference of possession." *Id.* at 1098–99. The court concluded that, "[i]n short, a finding that Hahn possessed any particular document would require speculation on the part of a jury." *Id.* at 1099. *See also SEC v. Goldfinger,* 106 F.3d 409, 1997 WL 21221 (9th Cir.1997) (table) (finding circumstantial evidence insufficient to defeat summary judgment in favor of defendants and infer tipping where one party had merely inquired to another in hallway about upcoming transaction); *SEC v. Hoover,* 903 F.Supp. 1135 (S.D.Tex.1995) (granting summary judgment for defendant on grounds that a "defendant's liability for insider trading can be based only on material, nonpublic information known at the time of the trade, not on information learned later").

The SEC cites *SEC v. Euro Sec. Fund,* 2000 WL 1376246 (S.D.N.Y. Sept.25, 2000) (J. Cote), which distinguished *Truong* on grounds that the SEC had offered evidence of evasiveness and inconsistent statements on the part of the alleged tipper that supported the inference of guilty knowledge, as well as documentary evidence connecting the alleged tipper to an insider. Specifically, the SEC claims that A.Duclaud and others demonstrated evasiveness by creating offshore trusts and corporations, and offers the Prodigy and El Globo transactions as "signature crime" evidence of a pattern of insider trading and payoffs. However, there is no evidence suggesting that A.Duclaud, nor any other defendant, was evasive in setting up the foreign trusts, which were created well before the CompUSA trades and which the defendants have identified as means for providing security and tax protection.

More significantly, there remains here no question of fact with respect to the acquisition of the "inside information" at issue: the making of the Slim tender offer. The SEC offers evidence surrounding the El Globo and Prodigy transactions as classic Rule 404(b) evidence, which is allowable to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b); *see, e.g., Huddleston v. United States,* 485 U.S. 681, 685, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). However, any such evidence of A.Duclaud's state of mind, opportunity, or intent surrounding the CompUSA transactions is controverted by the direct evidence, as supplied principally by Robles' testimony, that A.Duclaud could not have had access to any inside information concerning the tender offer by virtue of his association with Franck Galicia. Thus, even if the SEC were successful in its allegations as to the El Globo and Prodigy transactions,[2] there remains the undisputed fact that, with respect to CompUSA, Franck Galicia did not possess inside information at the time of virtually all of the defendants' trades.

---

**2.** Pursuant to the decision in the second part of this opinion granting the SEC's motion to amend, there remains the possibility of demonstrating liability as to the Prodigy transactions.

The SEC's case with regard to the CompUSA trades is ultimately too speculative to preclude summary judgment. Robles's statement that he was previously retained by Sanborns in 1999 to review the Schedules 13–G and 13–D before they were filed, but that it was not until the afternoon of January 20, 2000 that he was contacted by a lawyer at Cleary and informed of the impending tender offer, has not been countered by any evidence. The explanations of A.Duclaud and Igartua with respect to the transfers between the accounts overcomes the SEC's speculation of a payoff. Similarly, the failure of A.Duclaud to report the CompUSA transactions to the Mexican tax authorities and to the Franck Galicia firm based on the tax opinion he received, and the absence of any firm practice or requirement to do so, do not establish that an inference of guilty knowledge must be drawn against A.Duclaud. There was no attempt to conceal the existence of the offshore accounts or to remove the funds beyond the reach of the SEC.

Therefore, what has been claimed by A.Duclaud as the "dispositive hole in its [the SEC] theory" (Reply Mem. of A.Duclaud, at 1) has been established. Accordingly, A.Duclaud and the other defendants are entitled to summary judgment on the SEC's § 10(b) and Rule 10b–5 claim (Count One) and its Section 14(e) and Rule 14e–3 claim (Count Two).

### B. *There Was No Duty and No Breach*

The absence of any material, non-public information received by the Franck Galicia firm prior to January 20, 2000 sufficiently demonstrates the SEC's inability to present evidence as to a central element of both the Rule 10b–5 claim and the Rule 14e–3 claim. This paucity of evidence also demonstrates that there could be no fiduciary duty from that source in existence at the time of A.Duclaud's trades or the alleged tips, as required by § 10(b) and Rule

10b–5. Although the SEC seeks to infer that, aside from his affiliation with Robles, A.Duclaud may have acquired inside information directly from an insider of Sanborns or its affiliates, the SEC has failed to identify a "tipper" or to establish that A.Duclaud owed a duty to the unidentified source of the information. Thus, even if the purportedly suspicious timing of A.Duclaud's trades were sufficient to establish an issue of fact as to whether A.Duclaud traded on the basis of non-public information, the SEC's Rule 10b–5 claim (Count One) must be dismissed because of the failure to establish a duty or a breach. *See O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199.

This same reasoning applies to Count Two. Rule 14e–3 is violated where the defendant trades on the basis of material non-public information concerning a pending tender offer that he knew or had reason to know had been acquired directly or indirectly from an insider of the offeror or issuer or someone working on their behalf. Rule 14e, 17 C.F.R. § 240.14e–3; *see also O'Hagan,* 521 U.S. at 670–72, 117 S.Ct. 2199. Absent its speculations regarding information passing to A.Duclaud through the Franck Galicia firm prior to his trades, the SEC has not provided any evidence of an alternative source, or that A.Duclaud had reason to know that the source was an insider or the agent of an insider. Since the SEC has no evidence on this other essential element of its Section 14(e) and Rule 14e–3 claim, A.Duclaud is entitled to summary judgment in his favor.

### III. *The SEC May File An Amended Complaint*

Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." Wright & Miller have observed that:

[P]ermission has been granted under Rule 15(a) at various stages of the litigation: following discovery; after a pretrial conference; at a hearing on a motion to dismiss or for summary judgment; after a motion to dismiss has been granted but before the order of dismissal has been entered; when the case is on the trial calendar and has been set for a hearing by the district court; at the beginning, during and at the close of trial; after a judgment has been entered; and even on remand following an appeal.

6 Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1488 at 652–57 (1990) (footnotes omitted). Rule 15(b), captioned "Amendments to Conform to the Evidence," states in pertinent part that:

If evidence is objected to at the trial on the grounds that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

The Supreme Court has declared:

Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. If the underlying circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claims on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previ-ously allowed, undue prejudice to the opposing party ..., etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (citations omitted).

Our Circuit has also advised district courts to be "mindful that Rule 15(a) requires that such 'leave [to amend] shall be freely given when justice so requires.'" *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000) (*quoting* Fed.R.Civ.P. 15(a)). *See also, Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 18 (2d Cir.1997).

Discovery has not formally closed, and no trial date has been set. While the preceding determination has eliminated the CompUSA transactions of the defendants as being violative of the securities law, the SEC has sought to amend its complaint to add the transactions involving the shares of Prodigy and El Globo. The defendants seek denial of the motion on the ground that the SEC is acting in bad faith on the grounds that there was no basis for the delay in moving to amend since the facts relating to the El Globo and Prodigy transactions were described in the June 6, 2001 submissions of the SEC. Defendants also resist the motion on the grounds of undue prejudice and futility.

▉ As to the transactions relating to El Globo shares, the allegations and evidence so far have established that: (i) El Globo stock trades on the Mexican Bolsa; (ii) the defendants who are alleged to have traded in the stock are all Mexican citizens residing in Mexico; and (iii) the El Globo transaction took place entirely in Mexico, is governed by Mexican law, and is subject to the jurisdiction of the Mexican authorities. It has further been established that the Mexican counterpart to the SEC al-

**382**

ready has investigated the El Globo transaction.

Under the circumstances present in this case, where the securities in question are listed on a foreign exchange, the shareholders are also foreign, and the transactions took place in a foreign country, there is no basis for subject matter jurisdiction under the U.S. securities laws. *See Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London,* 147 F.3d 118 (2d Cir.1998) (holding sale of securities by agent for foreign bank to foreign corporate investor, which was represented by agent who was present in United States at time of sale, did not give rise to jurisdiction and explaining that this Circuit looks to "conduct, effects, or a combination thereof in the United States" to determine Congressional intent as to extraterritorial application of the anti-fraud provisions of the U.S. securities laws) (citations omitted); *Schoenbaum v. Firstbrook,* 405 F.2d 200, 208 (2d Cir.1968) (noting that there is subject matter jurisdiction over extraterritorial violations of the Securities Exchange Act when the transactions involve stock registered and listed on a United States securities exchange and are detrimental to the interests of American investors); *Investment Properties Intern., Ltd. v. I.O.S., Ltd.,* 1971 WL 258, at *11–12 (S.D.N.Y. Apr.21, 1971) (finding no subject matter jurisdiction where the defendants were foreign corporations with foreign principal places of business whose stock did not trade on any United States exchange or over any United States counter); *Finch v. Marathon Securities Corp.,* 316 F.Supp. 1345, 1349 (S.D.N.Y.1970) ("Thus, when, as here: (1) the substance of the allegedly fraudulent conduct occurred outside the United States; (2) the parties are predominantly foreign; (3) the subject shares are securities in a foreign corporation neither registered nor traded on a national securities exchange; and (4) there is no showing of any domestic injury, it would appear

that the district court is without subject matter jurisdiction, despite the existence of other less meaningful American-based facts and events."). The allegations with respect to El Globo do not constitute the basis for a cause of action but simply, potentially, § 404(b) evidence of intent.

Since the Prodigy claims relate to a period within two to three months of the CompUSA claims, and the defendants were on notice of the SEC's interest in these claims during the initial preliminary injunction discovery, the traditional form of prejudice has not been presented. As the Court of Appeals has stated, "the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *United States v. Continental Illinois Nat'l Bank & Trust Co.,* 889 F.2d 1248, 1255 (2d Cir.1989) (*quoting S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Bldg. 1 Housing Dev't Fund Co.,* 608 F.2d 28, 43 (2d Cir.1979)).

According to the SEC, it acquired information from the Franck Galicia firm, the Comission Nacional Bancaria y de Volares ("CNBV"), and Prodigy before moving to amend its complaint. Despite defendants' contentions that this constituted undue delay, such inquiry is acceptable. "[P]arties in such cases have been permitted to amend their pleadings long after they acquired the facts necessary to support those claims." *Richardson Greenshields Securities, Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987) (*citing Middle Atl. Utils. Co. v. S.M.W. Dev. Corp.,* 392 F.2d 380, 385 (2d Cir.1968) (amendment allowed after three-year interval and notice of trial readiness; plaintiff was aware of facts supporting new claims two years before filing of original complaint); *Green v. Wolf Corp.,* 50 F.R.D. 220, 223 (S.D.N.Y.1970) (amendment allowed after four-year interval; plaintiff was aware of facts asserted in amended

complaint from outset of case)). "Mere delay, ... absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Retirement Board v. Fluor Corporation*, 654 F.2d 843, 856 (2d Cir.1981) (amendment allowed after three-year interval). In this case, the motion to amend was filed within three and a half months of the original complaint, before any scheduling conference or scheduling order, and before four of the nine defendants had even answered the original complaint. The delay here does not constitute grounds for denial of the SEC motion.

Of the authorities cited by the defendants, the time period between the original complaint and the proposed amendment in those cases ranges up to a decade, and in every event a significant multiple of months longer than the three and a half month interval in this case. For example, in *County of Washington v. Counties of Warren and Washington Indus. Dev.*, 2001 WL 96566 (2d Cir. Jan.3, 2001), an unpublished Second Circuit opinion cited by defendants, the motion to amend came over four years after the case commenced, after the movant had already amended its pleading at least once, and after several claims from the original complaint had already been dismissed on motion. In *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60 (2d Cir.1990), the proposed amendments related to conduct in another lawsuit that had already been settled, the pleadings had already been amended twice, the proposed new amendment related to a new theory of law for which no delay could be justified, the proposed amendment came just six months after the court had permitted the second amended pleading, and the movant did not come forward with his new legal theory until after discovery was complete on his first theory and a motion for summary judgment had already been fully briefed. In *Ansam v. Cola Petroleum*, 760 F.2d 442, 446 (2d Cir.1985), the movant had already amended its pleading at least once, discovery was complete, a motion for summary judgment had been submitted, and the new claims so departed from what had already been litigated that the nonmovant had clearly not been "provided fair notice." In *Dellefave v. Access Temporaries*, 2001 WL 25745 (S.D.N.Y. Jan.10, 2001), the proposed amendment came after twenty-two months of litigation, after a dispositive motion had been fully submitted, and the movant admitted that the sole purpose of the amendment was to try to prevent resolution of the dispositive motion. In *Amaker v. Haponik*, 198 F.R.D. 386 (S.D.N.Y.2000), the movant had already repleaded at least once, the original and amended complaint had both already been partially dismissed on motion, the movant sought to add twenty new defendants on many of the previously dismissed claims, and venue was clearly improper for all of the proposed new defendants. Finally, in *Sanders v. Thrall Car Manufacturing*, 582 F.Supp. 945 (S.D.N.Y.1983), *aff'd*, 730 F.2d 910 (2d Cir.1984), the movant sought leave to file a third amended complaint to add charges under the Racketeer Influenced and Corrupt Organization Act ("RICO"), more than two and a half years after filing the original complaint, and all of the claims in the existing pleadings that could have served as predicate acts for the RICO claims were being dismissed in the same opinion.

As J.Duclaud has pointed out, he did not participate in any Prodigy trading and would therefore not be an appropriate defendant. While the remaining defendants, A.Duclaud, Igartua and Guerrero, may well have to undergo further discovery, that is not the sort of undue prejudice that warrants denial of the SEC motion and, of course, knowledge of the Prodigy/SBC transaction at the Franck Galicia firm without more, does not constitute "inside

information" known to A.Duclaud or passed by him to the purchasers.

It is also recognized that this action, altered by this opinion, if pursued, may result in modification of the existing freeze. However, in the context of the authorities, the SEC is entitled to amend its complaint to allege a securities violation arising out of the Prodigy transactions.

### Conclusion

For the foregoing reasons, the motions for summary judgement brought by the defendants are granted. The SEC's motion to amend the complaint to add allegations relating to securities violations arising out of the Prodigy transactions is granted.

It is so ordered.